2022 IL App (1st) 172982

FIRST DISTRICT
THIRD DIVISION
February 23, 2022

No. 1-17-2982

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 17941 |
| | ) | |
| MICHAEL TUCKER, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Michael Tucker and his alleged confederate, Kiontae Mack, were charged with the first-degree murder of Stephin Williams and the armed robberies of Williams and Breonna Clausell. A jury convicted defendant of all three offenses. A separate jury, sitting simultaneously, acquitted Mack on all counts.

¶ 2    Defendant argues on appeal that (1) his custodial statement should have been suppressed, because he was interrogated without counsel present, even after clearly invoking his *Miranda* rights; (2) the State's use of testimony from a peer-reviewing forensic scientist, rather than the forensic scientist who actually tested his samples for gunshot residue, violated his right to right to confrontation; and (3) the prosecutors committed misconduct in their closing and rebuttal arguments. We affirm.

¶ 3                                    BACKGROUND

¶ 4                                          I

¶ 5    The victims, Clausell and Williams, were out socializing on the night in question. Around

2 a.m., they sat in Williams's car, talking and eating some takeout. The car was parked in the driveway of Clausell's home near 49th Street and Drexel Boulevard in Chicago. Clausell testified that two black men walked past the back of the car, heading south on Drexel. They soon turned around, walked past the passenger's side (where Clausell was seated in the front), and stopped in front of the car.

¶ 6     One of the men, whom Clausell identified on cross-examination as codefendant Mack, pulled his shirt—a brightly colored, short sleeved polo shirt, perhaps white or yellow—up over the bridge of his nose. (On direct, Clausell initially said it was defendant who covered his face.) The other man, whom Clausell identified as defendant, pulled out a handgun.

¶ 7     Clausell had never seen these men before. She viewed them for 20 seconds or so, by her estimate, as they stood in front of the car. Although it was the middle of the night, the headlights were on (since the car was running), as were the streetlights and some motion-sensor lights on her garage that were activated when the men walked by.

¶ 8     Williams put the car in reverse and tried to drive away. Defendant, brandishing his gun, told Williams to put the car in park and unlock the doors. Williams complied. Defendant opened Williams's door, patted his pockets, and took his wallet and black Samsung phone. Codefendant opened Clausell's door and rifled through her purse. Defendant then reached over and tried to pat her down, at which point Williams started to fight back. He managed to get out, grab defendant, and throw him against the car. Williams then started running.

¶ 9     Codefendant grabbed Clausell's purse and ran over to the driver's side. Watching through the rear and side windows, Clausell heard codefendant say, "blast his ass." Defendant backed up and opened fire toward Williams as he ran south on Drexel. Clausell heard about six gunshots, and Williams eventually collapsed on the sidewalk. Defendant, gun in hand, ran north on Drexel

Boulevard, along with codefendant, toward three or four others who, as far as Clausell could tell, appeared to be waiting for them. Clausell lost sight of them when they ran around a nearby apartment building. She ran over to Williams—who was unresponsive and bleeding from his stomach, in front of the Reavis School at 50th Street and Drexel Boulevard—and called the police. The medical examiner later confirmed that Williams sustained four gunshot wounds, one of which was fatal on its own.

¶ 10                                          II

¶ 11    While on patrol in the area, Officer Randy Carter received a dispatch call of shots fired. He soon spotted defendant and codefendant walking near 49th Street and Drexel Boulevard. He detained codefendant, who made no effort to flee, but after seeing Officer Carter and pausing for a moment, defendant took off and fled down an alley. Officer Carter relayed a description of defendant—a young, light-skinned black man wearing a "light colored, like more white" shirt. After arriving on the scene and taking custody of codefendant, Officer Gordon Dameron spotted defendant at the end of the alley and detained him. Officer Carter identified him as the man he saw running.

¶ 12    Officer Carter retraced his steps through that alley—behind Operation PUSH headquarters at 50th Street and Drexel Boulevard, within a block or so of the shooting—and found a Samsung phone in or on top of a dumpster. Other officers later found Clausell's purse in that same alley and Williams's wallet in a lot adjacent to that alley. Detective Davis testified that those areas were searched based on the information Clausell provided about "the offenders' direction of flight."

¶ 13    Williams's car had a shattered windshield and driver's side window and a flat tire. Bullet fragments were found on the dashboard and the sidewalk, and 11 fired shell casings were found directly behind the car. Forensic analysis later confirmed that they were all fired from the same

gun. That gun was never found. The car, the shell casings, and the phone found in the alley were all processed for fingerprints. The only print suitable for comparison came from the passenger's side of the car, just above the front door handle. Defendant and codefendant were both excluded.

¶ 14                                    III

¶ 15    Meanwhile, Clausell remained at the scene of the shooting. Detective Davis testified that "[s]he was visibly upset. She was crying. She was shaking. She had moments where she had to catch her breath." Despite her understandable distress, Lieutenant Hoover—who also responded to the scene and was called as a witness by the defense—testified that Clausell said she "could definitely identify the shooter and maybe the second man." So the police took defendant and codefendant back to Clausell to be viewed in separate show-ups.

¶ 16    Clausell testified on direct examination that, when she first called the police, she described the shooter as a light-skinned black man with twists in his hair and wearing a light-colored shirt, perhaps blue, and jeans. The officers testified that Clausell never mentioned anything about hair twists and said that the shooter wore a white polo shirt, not a blue shirt. As it turned out, defendant was wearing a white polo shirt when he was detained. Clausell identified him as the shooter when she viewed him in the show-up.

¶ 17    Although Clausell also identified codefendant as the other assailant, Lieutenant Hoover's report indicated that her identification of codefendant at the show-up was tentative. And there was conflicting evidence from Clausell and various officers about codefendant's clothing—in particular, whether he wore a white, red, or blue shirt.

¶ 18    In the morning, Clausell went to the station and identified defendant again from a single photo. She noted that defendant wore his hair in an afro, rather than twists, in the photo. She also identified codefendant. She never viewed a full photo array or live lineup.

¶ 19                                             IV

¶ 20     Defendant was taken to an interrogation room around 3:30 a.m. and read his *Miranda* rights about three hours later by Detective David Roberts. A couple hours after that, he would go on to make an oral statement to the detectives, which the State offered into evidence.

¶ 21     Detective Roberts's partner, Detective Peter Maderer, testified that after defendant was read his rights, he agreed to speak to the detectives without having an attorney present. Before trial, defendant moved to suppress his statement, alleging that the police violated his *Miranda* rights by ignoring his request for an attorney and interrogating him even though he had invoked his rights. The trial court found that any request for an attorney was at best equivocal and that defendant had in fact waived his *Miranda* rights, and it denied the motion to suppress on this basis. We will have more to say about the disputed waiver, which was recorded, in due course.

¶ 22     Shortly before defendant was read his rights, Officer Clarence Jordan, an evidence technician, came into the interrogation room to collect swabs from defendant's hands for gunshot residue (GSR) testing. Detectives Maderer and Roberts, who were present at the time, explained this to defendant. While Officer Jordan was standing in the doorway, having stepped out of the room for a moment, he saw defendant spit into his hands. (Defendant told the detectives, on the video, that he had just sneezed.) Officer Jordan returned to the room and swabbed defendant's hands. After defendant was read his rights, his outer clothing was collected for GSR testing and he was provided with a paper or cloth gown to wear for the time being.

¶ 23     Ellen Chapman, a forensic scientist with the Illinois State Police, testified that she peer reviewed the report produced by Robert Berk (who had since retired) pertaining to the GSR analysis of the samples taken from defendant. Chapman concurred in Berk's conclusion that, based on the swabs of defendant's hands, he "either discharged a firearm, contacted gunshot residue-

related items or was in the environment of the discharged firearm." In light of that conclusion, his clothing was never tested. The parties also stipulated, in sum, that no GSR was detected in the samples taken from codefendant.

¶ 24    The detectives returned to the interrogation at 8:02 a.m. to talk to defendant about the events of the previous evening. The recorded conversation was published to the jury. Defendant told the detectives that he intended to rob Williams and Clausell. (To be clear, he did not know them or their names.) He pulled out a gun and took Williams's phone. At some point, Williams got out of the car and grabbed the gun. Defendant initially said that the gun went off a few times during the struggle. After further questioning, he acknowledged that Williams started to run and that he fired—or kept firing—as Williams ran away, although he also said that he was shooting at the ground. Defendant threw the gun in the street after the shooting.

¶ 25    About three hours later, an assistant state's attorney (ASA) read defendant his *Miranda* rights again and asked if defendant wanted to talk. After the ASA clarified for defendant that the interview would be conducted without an attorney present, defendant indicated that he did not want to be interviewed.

¶ 26                                          V

¶ 27    Defendant waived his right to testify. The jury found him guilty of first-degree murder and two counts of armed robbery and found that he personally discharged the firearm that proximately caused Williams's death. The trial court sentenced him to consecutive prison terms of 45 years for first-degree murder and 21 years for each count of armed robbery. This appeal follows.

¶ 28                                      ANALYSIS

¶ 29                                          I

¶ 30    The trial court denied defendant's motion to suppress his custodial statement, finding that

any invocation of his *Miranda* rights was at best equivocal. Defendant contests that finding. He argues that he clearly invoked his right to an attorney, not once but three times, and that he only "acquiesced" in an uncounseled interview because the detectives "badgered" him into doing so. Thus, he says, the use of his incriminating statements in the State's case in chief violated his right to counsel. Or more precisely, his " '*Miranda* right to counsel,' " as it is sometimes called—not the right to counsel *per se*, as guaranteed by the sixth amendment, but rather the right to have an attorney present during custodial questioning as a means of safeguarding the suspect's fifth-amendment right against compulsory self-incrimination. See *Davis v. United States*, 512 U.S. 452, 458 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991)).

¶ 31    At issue here is the application of the "*Edwards* rule": If a suspect in custody knowingly and intelligently waives his *Miranda* rights after being warned, law-enforcement officers are free to question him, but if he then requests counsel, at any time during the interview, the questioning must stop until an attorney has been made available to him or the suspect himself reinitiates the conversation. *Id.* at 458, 461; *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

¶ 32    The key aspect of the rule, for our purposes here, is that the questioning must stop only when the suspect's request for counsel is clear and unambiguous. *Davis*, 512 U.S. at 459, 461. For one, the suspect must specifically invoke the *Miranda* right to *counsel*; invoking the right *to remain silent* is not equivalent to demanding counsel. *Edwards*, 451 U.S. at 485. And the invocation must be free of equivocation or indecision. *Davis*, 512 U.S. at 459. In other words, it must be clear that the suspect has " 'actually invoked' " (emphasis omitted) (*id.* at 458 (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984))) his right to counsel, and not merely that he "*might* be invoking" the right (emphasis in original) (*id.* at 459).

¶ 33    The requisite standard of clarity is an "objective" one, judged from the perspective of a

reasonable officer in light of all relevant circumstances. *Id.* at 458-59. Bearing in mind that a suspect is not expected to " 'speak with the discrimination of an Oxford don,' " the question is whether, in his own way, he has managed to "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459 (quoting *id.* at 476 (Souter, J., concurring, joined by Blackmun, Stevens, and Ginsburg, JJ.)).

¶ 34    The rationale for adopting such an admittedly "rigid" rule is to provide a clear, bright line that officers can apply in real time, without requiring them to make "difficult judgment calls"— with the suppression of highly probative evidence on the line—about whether a suspect really wants a lawyer when he has not clearly and affirmatively said so. *Id.* at 458, 461.

¶ 35    The *Edwards* rule was designed, in the first instance, "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." (Internal quotation marks omitted.) *Id.* at 458. But our supreme court has held that it is not limited to post-waiver demands for counsel. Rather, it also applies when, as in this case, the disputed reference to counsel is made immediately after the *Miranda* warnings are read and, thus, before a valid initial waiver has been made and the questioning has begun in earnest. *In re Christopher K.*, 217 Ill. 2d 348, 381 (2005).

¶ 36    In general, we apply a bifurcated standard of review to a trial court's ruling on a motion to suppress statements: deference to the trial court's credibility determinations and findings of fact, under a manifest-weight standard, and *de novo* review on questions of law, including the ultimate question of whether the statement(s) should be suppressed. *Id.* at 373.

¶ 37    As noted above, the disputed reference to counsel was made immediately after Detective Roberts read defendant his rights and confirmed that he understood them. The parties agree that the exchange in question, between defendant and Detective Roberts, continued as follows:

"DETECTIVE: Do you want to talk to us or do you want an attorney?

DEFENDANT: [No response].

DETECTIVE: Simple question.

DEFENDANT: Attorney, I guess.

DETECTIVE: What's that?

DEFENDANT: Attorney.

DETECTIVE: Attorney. You want a lawyer?"

¶ 38    At that point, defendant shook his head from side to side and opened his hands. What he said is a matter of dispute. Defendant claims that he said, "Yeah." The State claims that he said, "I mean—."

¶ 39    Having reviewed the video ourselves, we heard defendant say, "I mean." Granted, he was mumbling, and the interrogation room's acoustics were less than ideal. In fact, Detective Roberts testified at the suppression hearing that he often had difficulty making out defendant's words because of the echo in the room. (The ERI confirms his point.) But that said, we simply cannot agree that the ERI provides any evidence of defendant saying "Yeah," in response to the question, "You want a lawyer?" And apart from the ERI, there is no other evidence to go on.

¶ 40    The parties also dispute, to some extent, what Detective Roberts said next. The State hears, "I mean, I'm asking you. It's a simple question. Do you want to ask—answer our questions or do you want to talk to a lawyer?" Defendant hears, "I ain't asking you that. It's a simple question. Do you want to talk to a lawyer?"

¶ 41    The differences may be immaterial. (And defendant's version has the detective leading with a non sequitur.) But for what it's worth, having reviewed the ERI, we again agree with the State's rendition.

¶ 42 The rest of the exchange is undisputed:

> "DEFENDANT: I want to talk.
>
> DETECTIVE: Do you want to talk?
>
> DEFENDANT: I want to talk.
>
> DETECTIVE: To us or an attorney?
>
> DEFENDANT: We can talk.
>
> DETECTIVE: What's that?
>
> DEFENDANT: I said we can talk.
>
> DETECTIVE: [Pointing to himself and defendant] We can talk?
>
> DEFENDANT: Yeah.
>
> DETECTIVE: OK. Alright. Stand tight, we'll be right back."

And with that, Detectives Roberts and Maderer left the room. They returned about an hour and forty minutes later and questioned defendant, without Mirandizing him again. Defendant then implicated himself in the robberies and shooting.

¶ 43 Let's take defendant's responses to Detective Roberts one by one. When first asked if he wanted to speak to the detectives or to an attorney, defendant answered, "Attorney, I guess." In *Davis*, 512 U.S. at 455, when the defendant ruminated, " 'Maybe I should talk to a lawyer,' " the statement was deemed equivocal. So too in *People v. Oaks*, 169 Ill. 2d 409, 452 (1996), where the defendant wondered aloud, " 'Should I see a lawyer?' "

¶ 44 Defendant's first answer here, qualified as it was by "I guess," is cut from much the same cloth as these equivocal references to counsel. It was not a firm, clear invocation of his right to counsel, and it was reasonable for the officer to perceive defendant as hesitant, unsure, and still wondering how to proceed. Granted, he "*might*" have been asking for a lawyer in that moment,

- 10 -

but "*might*" does not require an immediate end to questioning. (Emphasis in original.) *Davis*, 512 U.S. at 459. Even defendant acknowledges, albeit reluctantly, that his initial answer to Detective Roberts "may have been equivocal." Indeed it was.

¶ 45    Objectively viewed, defendant's first response was not a clear invocation of his right to counsel. What's more, the detective's first follow-up question—"What's that?"—suggests at least some uncertainty, on his part, about what defendant just said. (Recall that the detective had testified, at the suppression hearing, that he had periodic difficulty hearing defendant because of the room's poor acoustics.) When a suspect makes an ambiguous or equivocal statement—or for that matter, when the officer is not entirely sure what was just said—it is of course "good police practice" to seek clarification by posing follow-up questions, as the detective did here. *Davis*, 512 U.S. at 461; *Oaks*, 169 Ill. 2d at 453.

¶ 46    In response to that first follow-up question, defendant said, "Attorney," dropping the qualifier, "I guess," that rendered his first statement plainly equivocal. Thus, if we were to view this one-word statement, "Attorney," in isolation, it would be at the very least arguable that defendant was invoking his *Miranda* right to counsel and hence that the interview had to stop before it had even begun.

¶ 47    But we don't view this statement in isolation. We take stock of its full context and the surrounding circumstances, as a reasonable officer would have perceived them at the time. See *Davis*, 512 U.S. at 459; *Christopher K.*, 217 Ill. 2d at 381. To this end, we agree with the trial court's assessment that defendant's statements were made within seconds of each other, in one "continuous" exchange, during which Detective Roberts often had difficulty making out defendant's words. Taking these circumstances into account, Detective Roberts's second follow-up question—"Attorney. You want a lawyer?"—appears to be a good-faith effort to seek clarity

about what defendant wanted (given his initial equivocation), or what defendant literally said (given his mumbling and the room's echo), or some combination of the two. Whatever the case may be, so far, we perceive no basis for accusing the detective of "badgering" defendant into a waiver.

¶ 48 The parties dispute what defendant said in response to the detective's second follow-up question. Defendant claims in his brief that he said, "Yeah." If that was true, defendant would have invoked his *Miranda* right to counsel. So if that was true—and if Detective Roberts heard him clearly—the allegation of "badgering" would start to have real force here. But "Yeah" is evidently not what the detective heard. And as we noted above, it is not what we heard, either, when reviewing the ERI.

¶ 49 Like the State, we heard defendant say, "I mean." At the same time, he shook his head from side to side and opened his hands. The gesture clearly strikes us as one of uncertainty, equivocation, indecision, which matches the equivocation of his words. Far from clearly requesting an attorney, defendant was hemming and hawing.

¶ 50 So there was still lingering uncertainty at this juncture. Defendant's apparent indecision was on display in phrases like "I guess" and "I mean." And amidst the mumbles and the echoes, the detective felt a repeated need to ensure that he was accurately discerning defendant's words. For one or both of these reasons, Detective Roberts reasonably asked defendant, one more time— and this time point blank—"Do you want to talk to a lawyer?"

¶ 51 If defendant's answer was yes, he could—and should—have said so at this point, and that would be the end of the matter. But he didn't. And for the reasons we have explained, he cannot blame that failure on the detective's so-called badgering. To the contrary, the circumstances gave the detective ample reason to seek clarification of defendant's wishes by posing the three follow-

up questions that he did, in quick succession, all in less than a minute's time.

¶ 52    Instead of invoking his rights, defendant said, "I want to talk." From this point forward, nothing that he said even arguably amounted to a request for an attorney. Faced with several requests for confirmation and sometimes clarification, defendant reiterated, no less than four times, that he was willing to talk—to the detectives, that is, without an attorney present. (As none of this is disputed, we will not belabor the details.)

¶ 53    As the detectives and the trial court concluded, defendant waived his *Miranda* rights when he agreed to speak to the police without an attorney. And nothing that he said in the conversation leading up to the waiver amounted to a clear, unequivocal request for an attorney that Detective Roberts "badgered" him into revoking. Applying the standards articulated in *Edwards* and *Davis* in this pre-waiver setting (see *Christopher K.*, 217 Ill. 2d at 381), defendant thus failed to invoke his *Miranda* right to counsel.

¶ 54    Defendant's conversation with the assistant state's attorney (ASA) does not, as he argues, show otherwise. About three hours after the detectives interviewed defendant, an ASA came into the interrogation room to do the same. The ASA gave him a fresh round of *Miranda* warnings, defendant requested an attorney, and the ASA ended the interview. Defendant argues that, in his conversation with the ASA, "he invoked his right to counsel in much the same way as he did to [Detective] Roberts" and thus the detective, like the ASA, should have honored his clear request for an attorney.

¶ 55    We disagree with defendant's claim that his statements to the ASA were "much the same" as his statements to the detective. After the ASA read defendant his rights and explained to him what a prosecutor is, the following exchange ensued:

        "PROSECUTOR: Knowing those rights and knowing who I am, do you wish to

talk to me?

      DEFENDANT: With an attorney? Or?

      PROSECUTOR: Knowing that stuff that I just told you, I need to know if you want to talk to me?

      DEFENDANT: Are you asking if I want to talk with an attorney or without?

      PROSECUTOR: That's what I'm asking you.

      DEFENDANT: I'll talk to you with an attorney.

      PROSECUTOR: You would talk to me with an attorney?

      DEFENDANT: Yeah.

      PROSECUTOR: OK. So is that what you're saying? You do not want to have this interview without an attorney?

      DEFENDANT: Yes."

The ASA then promptly ended the interview.

¶ 56    Unlike in his responses to Detective Roberts, defendant never equivocated when he spoke to the ASA. He never expressed hesitation or uncertainty with phrases like "I guess," or "I mean." Once the parameters of the ASA's question became clear to defendant, he answered, in no uncertain terms, that he wanted an attorney present before the interview continued. He did not do the same before he agreed to speak to the detectives.

¶ 57    Lastly, defendant's principal citation, *People v. Harris*, 2012 IL App (1st) 100678, is easily distinguished. In *Harris*, the defendant asked whether it was " 'possible' " to " 'have a few days to get an attorney,' " to which the detective answered, " 'no.' " *Id.* ¶ 70. We held that this query was an unequivocal invocation of her *Miranda* right to counsel. *Id.* ¶ 72. As we explained, "[a]ny ambiguity in her statement was with regard to how long it would take and the process of acquiring

an attorney, not with regard to whether defendant wanted one." *Id.* But here, for the reasons we have explained, the ambiguity *did* pertain to whether defendant wanted an attorney present when he spoke to the detectives. *Harris* thus fails to support his claim of a *Miranda* violation. The trial court properly denied the motion to suppress statements.

¶ 58                                                         II

¶ 59      Robert Berk, a forensic scientist with the Illinois State Police, tested the GSR swabs that Officer Jordan took from defendant's hands. Berk concluded, in sum, that GSR was present. By the time of trial, however, he had retired and was unavailable to testify. In his place, the State called Ellen Chapman, another Illinois State Police forensic scientist who did not conduct any laboratory testing or analysis of defendant's samples, but who had peer-reviewed Berk's report. Chapman testified that based on the information conveyed in Berk's report, she concurred with his conclusions.

¶ 60      Defendant contends that allowing Chapman to testify to the "observations, analysis, and conclusions" drawn by Berk violated his sixth-amendment right to confrontation. Because the alleged error was not raised below and is thus forfeited, defendant seeks relief under theories of first-prong and second-prong plain error, as well as ineffective assistance of counsel.

¶ 61      The sixth amendment's confrontation clause provides: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403 (1965) (clause applies to state-court prosecutions). It prohibits the admission of a testimonial hearsay statement against a criminal defendant if the witness who made the statement was unavailable at trial and the defendant did not have a prior opportunity to cross-examine the witness. *Davis v. Washington*, 547 U.S. 813, 822 (2006); *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The clause "is quite properly an almost total ban

on the introduction of accusations against the accused by persons not present for cross-examination." *Ray v. Boatwright*, 592 F.3d 793, 796 (7th Cir. 2010). We review *de novo* the constitutional question of whether a defendant's right of confrontation was violated. *People v. Barner*, 2015 IL 116949, ¶ 39.

¶ 62    The parties dispute whether Berk's report was put to a hearsay use at trial; if so, whether that hearsay was testimonial; how best to interpret the United States Supreme Court's fractured decisions on the topic of surrogate forensic testimony (*Williams v. Illinois*, 567 U.S. 50 (2012); *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009)); and whether, under our precedents, Chapman was sufficiently involved in the laboratory process in her role as Berk's peer reviewer that the opportunity to cross-examine her satisfied the confrontation clause. See, *e.g.*, *People v. Nelson*, 2013 IL App (1st) 102619, ¶¶ 65-68.

¶ 63    Some of these disputed questions entail significant doctrinal complexity. But however we might resolve them, the answers would not affect our disposition of this case. Even if we assume, without deciding, that the confrontation clause was violated here, the error would not warrant a new trial on any theory of relief.

¶ 64    To show his counsel was ineffective in failing to object to this testimony, defendant must show not only deficient performance but prejudice—more specifically, a reasonable probability that the verdict would have been different had the GSR analysis been excluded. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). On first-prong plain-error review, defendant may obtain relief based on a forfeited error that is "clear or obvious" if the evidence was "so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *People v. Belknap*, 2014 IL 117094, ¶ 48. The prejudice analysis in *Strickland* is quite similar to the closely-balanced

analysis of first-prong plain error when the claim is based on the erroneous admission of evidence. See *People v. White*, 2011 IL 109689, ¶ 133.

¶ 65     A defendant may obtain relief under the second prong, even if the evidence was not closely balanced, if he can show "that the alleged error was serious enough to affect the fairness of the trial or to undermine the integrity of the judicial process." *People v. Mudd*, 2022 IL 126830, ¶ 22.

¶ 66     Defendant notes in his brief that prejudice is presumed if a second-prong error is found. That is certainly true (see *id.*), but to the extent that defendant suggests that all we need determine is whether an error occurred, and if so reverse, we cannot agree. The first step in the process of any plain-error review is to determine whether an error occurred in the first place. *Id*. To say that a finding of error would end the analysis, full stop, and result in reversal under the second prong of plain-error review would be incorrect for several reasons.

¶ 67     For one, it would equate confrontation-clause errors with structural errors, a " 'limited category of constitutional errors that are deemed prejudicial in every case.' " *People v. Patterson*, 217 Ill. 2d 407, 425 (2005) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 68 (1986)). Our supreme court in *Patterson* made it clear that confrontation-clause errors do not belong in the limited class of structural errors. *Id*. (Nor are second-prong errors limited to that narrow category of structural errors. See *People v. Clark*, 2016 IL 118845, ¶ 25.)

¶ 68     For another, adopting the position that a finding of a confrontation-clause error will automatically lead to reversal would reward defendant's forfeiture of the issue on appeal. That is to say, if a reviewing court finds a *preserved* constitutional error, a harmless-error analysis follows—the State must show that the error was harmless beyond a reasonable doubt. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005); *Delaware v. Van Arsdall*, 475 U.S. 673, 682 (1986). It

would be perverse to then hold that, if a defendant *forfeits* the claim of confrontation-clause error, he need only show the error itself and obtain automatic reversal.

¶ 69    It is clear, then, that more than a mere finding of error is necessary for a defendant to obtain reversal under the second prong of plain error. That is why our supreme court has repeatedly emphasized that determining whether an error occurred is only the *first* step of any plain-error review. *Mudd*, 2022 IL 126830, ¶ 22. And if error is found, under the second prong, the court must then determine whether that error "was serious enough to affect the fairness of the trial or to undermine the integrity of the judicial process." *Id*. We cannot determine the seriousness of the error and its impact without, of course, considering the particular circumstances of this case.

¶ 70    Here, the evidence against defendant was overwhelming, and the role that the GSR analysis played in the trial was comparatively minor. Our conclusion that the evidence against defendant was overwhelming all but follows from his confession to the detectives. He acknowledged, in no uncertain terms, that he "intended to rob" Williams and Clausell. Tellingly, defendant began to fill in some of the details of the robberies and shooting spontaneously, before the detectives conveyed any such details to him, either through the questions they posed or their cursory summaries of codefendant's statement.

¶ 71    For example, defendant spontaneously offered that the robbery began with him taking Williams's phone and that, soon after he did, Williams got out of the car, which precipitated a struggle between them. Defendant initially claimed that the gun went off during the struggle, as if to say by accident, but it was not long before he acknowledged that in fact he fired toward Williams as Williams was running away. (This last fact, to be clear, is one that the detectives did confront him with.)

¶ 72    Defendant's independent knowledge of various details weighs heavily in favor of finding his confession to be reliable and trustworthy. And the other circumstances of his confession do not reveal any serious reason to believe that he was led to falsely implicate himself. See *Crane v. Kentucky*, 476 U.S. 683, 688-89 (1986) (credibility of confession, unlike legal question of voluntariness, is question of fact for jury to decide from evidence of surrounding circumstances).

¶ 73    Defendant notes, for example, that he was not offered food until he confessed. Perhaps, but he initiated a robbery and murder in the middle of the night, around 2 a.m. or so, arrived at the station (or at least in the interrogation room) around 3:30 a.m., and confessed around 8 a.m.—after which, by his own admission, he was offered food. His complaint, then, is that he was not offered a middle-of-the-night meal—hardly a reason to discount his admissions. The same goes for the fact that he had been wearing "paper clothing," as he describes the gown he was given after his outer clothes were collected for GSR testing, for approximately an hour and a half (he asserts, misleadingly, that it was "hours") when he confessed.

¶ 74    And then, of course, there is Clausell's identification of defendant. We acknowledge that the identification, on its own, is not especially strong—it was first made at a show-up, then from a single photograph of defendant. At no point did Clausell identify defendant in a lineup or even a photo array. So she has never proven (because she was never asked to prove, as far as we know) that she can pick defendant out from a group of reasonably similar looking people. And that does dampen, to some degree at least, one's confidence in her identification.

¶ 75    That said, Clausell did identify defendant, and in notable contrast to her identification of codefendant, she was never "tentative" about her identification of defendant. And in any event, the question is not how well the identification would hold up when considered on its own. Clausell's identification and defendant's confession are mutually corroborating, and together they make a

strong case, indeed. Circumstantial evidence of defendant's flight from the police in the very alley where Williams's phone was found (and adjacent to the lot where Clausell's belongings were found), within minutes of the call of shots fired, only strengthens that case even further.

¶ 76 For these reasons, defendant cannot prevail on an ineffectiveness claim or under first-prong plain-error review. The evidence was far from closely balanced, and we find no reasonable probability that the outcome would be different had the GSR testimony been excluded. Nor do we find, under the second prong of plain-error review, that the error (if any) in allowing the GSR testimony denied defendant a fair trial or undermined the integrity of the trial, as the role the GSR testimony played in the trial was relatively minor.

¶ 77                                                    III

¶ 78 Lastly, defendant argues that the prosecutors made improper comments in their closing and rebuttal arguments. We begin with closing argument, where the prosecutor made pronouncements about "post-traumatic memory recall" that defendant claims were "seemingly based on expert testimony never offered." And these pronouncements, defendant says, were used to "bolster" Clausell's "less than reliable" identification of him as the shooter.

¶ 79 The disputed comment by the State was as follows:

"Now, when something happens, something traumatic, you do the best that you can, but your brain is processing. You are trying to figure out what is going on. She just saw her friend gunned down in the street over nothing. She gave a good description on scene. As the trauma started to subside some, she was able to recall more. That's common sense, ladies and gentlemen. That's normal. You remember things as your memory and your brain allows you to handle more and more because when trauma happens, when you see something traumatic you go into survival mode, and there is only so much you can

process."

¶ 80    But defendant says precious little about the context of this remark. The prosecutor was discussing a key factor in assessing the reliability of an eyewitness identification—"[h]er earlier description of the offender," in the prosecutor's words. See *People v. Slim*, 127 Ill. 2d 302, 308 (1989); Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000).

¶ 81    When Clausell first spoke to the police on scene, moments after the robbery and shooting, she described the shooter, whom she later identified as defendant, as a light-skinned black male wearing a light-colored shirt and jeans. At trial, Clausell recalled describing the shirt to the police as perhaps blue; but the detectives testified that she described defendant as wearing a white polo shirt (that is, one with a collar)—which is exactly what defendant was wearing when he was apprehended and identified minutes later. Clausell also testified that she described him as wearing his hair in twists, but the detectives denied that she included that detail. The detectives further testified that, when they first met with Clausell and took her description, she "was visibly upset. She was crying. She was shaking. She had moments where she had to catch her breath."

¶ 82    In this context, the prosecutor argued, as quoted above, that Clausell "gave a good description on scene." After the disputed remark, the prosecutor summed up the factor under discussion: "It," meaning Clausell's initial description, "is not inconsistent. It is not getting it wrong. It's[,] she got it right. They got the guy."

¶ 83    The overall point of the prosecutor's argument was that Clausell's initial description of defendant was accurate—enough, anyway, to credit her identification. Defendant may dispute that, but it was a fair argument. Granted, her description was somewhat generic, and even more so if one credits the officers' testimony that she did not mention the hair twists. Naturally, this was a line of argument pursued by the defense, starting in opening statement, and the prosecutor was

responding to it here. To this end, the prosecutor argued, in so many words, that Clausell shouldn't be expected to convey every last detail in the moments immediately following such a violent event, when its traumatic effects were still evident in her crying, shaking, and struggling to catch her breath. So if she left out some of the fine details at that moment, it doesn't mean that she could not reliably identify defendant when she saw him. This, too, was a fair argument, particularly in response to the defense's own argument to the contrary.

¶ 84     What's more, unlike in *People v. Lowry*, 354 Ill. App. 3d 760 (2004), a case cited here by defendant, the prosecutor never claimed the mantle of science without a basis in the record for doing so. In *Lowry*, the prosecutor asserted that there were " 'studies' " supporting the State's view of the relevant issue, prompting us to remind the State, on appeal, that it should not purport to reference any studies to the jury that were not in evidence at trial. *Id.* at 771-72. The prosecutor made no such reference here, claiming only that the State's view was supported by "common sense," which the defense was free to—and did—dispute.

¶ 85     Defendant also objects to the prosecutor's remarks in rebuttal, addressing the relative lack of physical or forensic evidence:

> "PROSECUTOR: You know what else we don't have that you don't need? We don't have DNA. Guess what, this is not Hollywood. This is not CSI, and this is not TV.
>
> COUNSEL: Objection.
>
> THE COURT: Overruled.
>
> PROSECUTOR: We are not in a big fancy courthouse.
>
> COUNSEL: Objection.
>
> THE COURT: That is a true statement.
>
> COUNSEL: You are right. I'm sorry. I withdraw it.

PROSECUTOR: We don't have the fanciest of equipment, but we don't need that. Just like you don't need DNA to convict the defendant. You will not receive a jury instruction that states in order to convict Michael Tucker of murder, you need DNA. You are not going to get that because you don't need that because we have other evidence. Same with the fingerprints. We don't have fingerprints because again, this isn't Hollywood. This isn't TV. This is real life."

¶ 86 In these remarks, defendant says, the prosecutor "minimized the State's burden of proof" and "knowingly disparage[d] the reasonable doubt standard," and she did this "by implying that the State's burden 'in real life' does not require the same amount of evidence to convict a defendant as depicted in television shows."

¶ 87 We find no merit to this argument. It is of course improper for the State to minimize its actual burden of proof. But it is not improper to distinguish real life from television. And it is true, as the prosecutor said, that the reasonable-doubt standard does not require DNA or fingerprint evidence, so long as "other evidence"—say, a confession, an eyewitness identification, circumstantial evidence, or all of the above—proves that the defendant committed the charged crime(s). In fact, nothing that the prosecutor said about the State's burden of proof, in an actual court of law, was incorrect. Defendant does not even claim that it was.

¶ 88 Nowadays, preconceptions about forensic evidence, and its routine availability, seem to abound in the popular imagination, not least because of the sometimes fanciful depiction of the subject in television crime procedurals. Nothing against these shows or their audiences, but they are entertainment, with no particular claim or obligation to be faithful to the realities of criminal investigation and adjudication. Reminding the jurors to put aside any preconceptions they may have gleaned from television, about the evidence they might have expected to see in a criminal

case, is hardly improper. On their own, such comments do not minimize the State's burden of proof or mislead the jurors about what that burden really is. To the extent that defendant's cited case, *Boatswain v. State*, 872 A.2d 959 (Del. 2005), may hold otherwise, we respectfully disagree. We find no prosecutorial misconduct.

¶ 89                                    CONCLUSION

¶ 90    For these reasons, we affirm the judgment of the circuit court.

¶ 91    Affirmed.

**No. 1-17-2982**

| | |
|---|---|
| **Cite as:** | *People v. Tucker*, 2022 IL App (1st) 172982 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-17941; the Hon. Charles P. Burns, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Maria A. Harrigan, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Iris G. Ferosie, and Tyler J. Cox, Assistant State's Attorneys, of counsel), for the People. |