2023 IL App (1st) 221361-U
Order filed: August 3, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-1361

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 17459 |
| | ) | |
| ANIBAL AGUILAR, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Lampkin and Justice Hoffman concurred in the judgment.

**ORDER**

*Held*: Defendant's conviction is affirmed where, even if a violation of his right to confrontation is assumed, plain error could not be established as the evidence of defendant's guilt was overwhelming and any improperly admitted evidence was cumulative of other properly admitted evidence.

¶ 1    Defendant-appellant, Anibal Aguilar, appeals from his convictions for predatory criminal sexual assault and aggravated criminal sexual abuse. On appeal, defendant contends that the trial court committed plain error by admitting evidence that violated his constitutional right to confrontation. For the following reasons, we affirm.

¶ 2    In December 2018, defendant was charged by indictment with three counts of predatory criminal sexual assault and six counts of aggravated criminal sexual abuse. The counts generally

alleged that between April 20, 2012, and November 17, 2018, defendant sexually abused M.Z., a minor. The matter proceeded to a jury trial on those charges in June 2022.

¶ 3    Idalia Jaimes, M.Z.'s mother, testified at trial through an interpreter that she was the wife of defendant. She had four children, and defendant was the stepfather of the three oldest— including M.Z.—and the father of her youngest child. Both Jaimes and defendant were undocumented, but the children were citizens. Jaimes had applied for a special visa for those involved in a criminal case. The family lived in Chicago, across the street from the hair salon Jaimes owned.

¶ 4    On the night of November 17, 2018, Jaimes was working at her salon, doing the hair of Olga Camacho. M.Z., was present, as was Camacho's daughter. The salon had three stations for hair styling in the main area, a bed for doing facials further back near the register, and a small storage room in the rear near the bathroom. A two-way mirror above the register was situated between the storage room and the main floor of the salon.

¶ 5    At approximately 9 p.m., defendant arrived at the salon and spoke with Camacho. During this time Jaimes could see M.Z. combing a doll's hair on the bed. Jaimes then saw defendant talking to M.Z. for a few minutes in the area between the back room and the bathroom but was unable to hear what they were saying.

¶ 6    About 15 minutes later, when Jaimes was finished working on Camacho's hair, she called for her daughter who was nowhere to be seen. She then walked behind the counter, looked through the two-way mirror, and saw defendant in the back room putting his penis back in his pants while M.Z. left the room. Jaimes confronted defendant and asked him, "what's going on." Defendant responded that, "it was nothing." M.Z. had returned to the bed she had been sitting on earlier and

was talking to Camacho while Jaimes called the police. Defendant left the salon and walked across the street to their home.

¶ 7    After police arrived, Camacho drove Jaimes and M.Z. to the hospital, where a sex assault kit was performed on M.Z. The next morning, before going to the Chicago Children's Advocacy Center (CCAC), M.Z. told Jaimes that defendant had been abusing her for many years when Jaimes was not around. M.Z. said that he would hurt her with his penis and fingers in her vagina. Jaimes then took M.Z. to the CCAC. She never told M.Z. what to say while there.

¶ 8    M.Z., born April 20, 2006, was 16 years old when she testified. M.Z. testified that on November 17, 2018, when she was 12 years old, she was at the salon with her mother, Camacho, and Camacho's daughter. When defendant arrived, she was sitting in the back area of the salon braiding a doll's hair. Defendant greeted Jaimes and made his way to the back room. Defendant sat in a chair and asked M.Z. to sit on his lap. The two were alone the back room. M.Z.'s back was to defendant's chest, and they were both facing the same direction. Through the two-way mirror, M.Z. could see her mother was finishing up Camacho's hair.

¶ 9    M.Z. testified she could feel that defendant's penis was hard. Defendant began touching M.Z.'s breasts underneath her bra. Defendant used his fingers to touch M.Z.'s vagina and "he kind of went like in and out" of "the hole of [her] vagina." M.Z. testified that defendant kissed her on her neck and on her mouth. When defendant unzipped his pants and pulled her pants down, M.Z. could see his penis and defendant then rubbed his penis back and forth on her "bare butt." While defendant was doing this, his breathing started getting heavier and quicker. Defendant moved his penis towards her vagina and rubbed it on the skin of her vagina but did not put it in her "vagina hole." While defendant was doing this, M.Z.'s mother began walking towards the back room and defendant stopped. M.Z. could see her mother peeking through the two-way mirror, and M.Z. got

up and went to sit on the bed in the front room. Her mother started yelling at defendant, and he left the salon.

¶ 10    Police arrived, and then M.Z. went to the Swedish Covenant Hospital with her mother, Camacho, and Camacho's daughter. M.Z. met with two police officers there, then described what had happened to a nurse. M.Z. disrobed and showed the nurse where on her body defendant had contact with her. A sex assault kit was administered, which involved taking swabs from different parts of M.Z.'s body and recovering M.Z.'s clothes. After being discharged, M.Z. went home to sleep.

¶ 11    The following morning, M.Z. spoke with a woman named Felicia at CCAC. Subsequently, M.Z. went to Lurie Children's Hospital where she had previously been treated "too many [times] to count" for urinary incontinence, headaches and urinary tract infections, all of which began after defendant began touching her.

¶ 12    The incident on November 17, 2018, was not the first time defendant had touched M.Z. She did not remember the first time it occurred, but she recalled him touching her as early as age four. Defendant would touch M.Z.'s vagina and breasts with his hands, and defendant would take M.Z. into the bedroom he shared with her mother and put his mouth on her vagina. M.Z. said this happened "[f]or as long as I can remember." Defendant would close and lock the bedroom door when he touched her. Defendant also touched his penis to her vagina in the same bedroom. At times, defendant "tried to put [his penis] all the way in [the hole of her vagina], while at other times he would just move it back and forth." Defendant would ask M.Z. if she liked it. M.Z. never told anyone about the abuse because she was scared, and she initially thought it was normal. Defendant also told her not to tell anyone or she would get in trouble with the police.

¶ 13     On cross-examination M.Z. testified that she told the police officers what had happened on November 17, 2018, but did not tell them everything that defendant had done to her over the years. M.Z. testified that defendant had been sexually abusing her a few times a week from the time she was four until she was 12 years old.

¶ 14     Theresa Gaudio, a registered nurse at Swedish Covenant Hospital, testified that she is a trained Sexual Assault Nurse Examiner (SANE). On November 17, 2018, M.Z. was her patient. She described M.Z. as withdrawn, tearful, using short one-word sentences and not making eye contact with her. As part of her medical forensic examination, Gaudio asked M.Z. what had happened to her. Gaudio quoted M.Z. as saying, "I was in my mom's beauty shop and my stepfather came into the shop. He came into the back room and told me to come into the back room. He told me to sit on his lap and he started to kiss my neck." At that point, M.Z. pointed to the back of her neck where Gaudio observed a red mark. M.Z. further stated,

> "[H]e kissed my face all over and kissed my mouth. He then put his hands on my chest and fondled my breasts. He put his hand in the front of my pants and he put his finger into my private parts. He then pulled his pants down and tried to put his private parts into my private part. He hurt me and he stopped. I got up and told my mother what happened and she called the police. He has done this to me a couple of times before."

¶ 15     Gaudio also performed a sexual assault kit on M.Z. This included swabbing of M.Z.'s neck, chin and face, the areas M.Z. said defendant kissed and licked her. Gaudio also swabbed the small of M.Z.'s back, the folds of her legs in her groin area and the outside of her vaginal area. She also collected M.Z.'s fingernail clippings as well as a pubic combing sample, and took an anal swab and a vaginal swab from M.Z.'s body. She then collected blood from M.Z. for DNA analysis.

Upon completion, Gaudio sealed the kit and locked it in a cabinet until it was retrieved by the police.

¶ 16    Gaudio testified that M.Z. was prescribed medications for sexually transmitted diseases, nausea and antibiotics; she was referred to Lurie Children's Hospital for follow-up treatment. Gaudio also testified that a urinary tract infection is a bacterial infection of the urine which may be caused by not wiping properly, such as wiping from the back to the front, or by sexual activity such as the penis rubbing against the urethra from the back side to the front.

¶ 17    Felicia Papafio, a forensic interviewer for the CCAC, described her recorded forensic interview with M.Z. on November 18, 2018, which was admitted into evidence and published to the jury. During the recorded interview, M.Z. stated that defendant began abusing her when she was around 6 years old, and that defendant had been touching her for years and that it happened "a lot." M.Z. then described the events of the previous night, and her description was consistent with her trial testimony.

¶ 18    Gregory DiDomenic, a DNA supervisor at the Illinois State Police (ISP) Forensic Center, testified as an expert in forensic DNA analysis. DiDomenic explained how DNA analysis allows for the differentiation between individuals as possible donors of a given DNA stain. He provided an overview of how DNA analysis is carried out at the ISP laboratory, including how the originally assigned analyst authors the final report. Then he described his review of the work of forensic scientist Angela Kaeshamer, who conducted the actual DNA analysis in this case for the ISP lab. DiDomenic testified that according to his review, the proper procedures were followed in the testing and analysis of the DNA materials in this case.

¶ 19    Based on his review of this case, DiDomenic was able to conclude that the swab from M.Z.'s neck contained a mixture of DNA profiles that could not be separated out. Given that it

could be assumed that M.Z.'s DNA profile would be present on a swab from her own neck, the lab subtracted out her contribution, leaving one remaining DNA contributor. The analysis revealed a remaining male DNA profile, from which defendant "cannot be excluded." DiDomenic testified that the statistical frequency of finding that male profile in the general population was one in one nonillion.

¶ 20    DiDomenic also testified that the vaginal swab taken from M.Z. was analyzed at a private laboratory, not by the ISP. He did not testify about those specific results, but stated that it is possible for penis-to-vagina contact to take place without leaving male DNA behind. On cross-examination, DiDomenic stated that it was not possible to know how long a DNA stain might have persisted on a given surface. He also acknowledged the possibility of DNA transfer where two or more people lived together.

¶ 21    Thereafter, several stipulations were entered into evidence, establishing that: (1) a proper chain of custody was maintained at all times with respect to M.Z.'s sexual assault kit and a buccal swab taken from defendant, (2) the vaginal, oral and anal swabs and the swabs from M.Z.'s lower back and buttocks were analyzed, and they contained no male DNA, (3) swabs collected from M.Z.'s chest, anterior neck and chin contained too much female DNA to detect a male donor, and (4) no semen was detected on the underwear collected from M.Z. The State also introduced M.Z.'s birth certificate into evidence, which showed she was born on April 20, 2006.

¶ 22    Detective Emily Rodriguez, assigned to the Chicago Police Department's Special Investigations Unit, testified that she interviewed defendant on November 18, 2018. The interview was video recorded. Detective Rodriguez spoke to defendant in Spanish because he preferred that to English. After acknowledging that he understood his *Miranda* warnings, defendant chose to speak with the detectives.

¶ 23    In that statement defendant admitted that on the prior evening in the back room of his wife's salon, he had M.Z. sit on his lap, facing away from him and he put his hand in her pants beneath her underwear and touched her vagina. He said he rubbed the lips of M.Z.'s vagina with the middle finger of his right hand. He also said he kissed M.Z. on the lips the way a boyfriend kisses his girlfriend. At that moment, defendant saw his wife approaching, M.Z. got off his lap, and defendant said his wife saw him pulling up the zipper of his pants. Defendant said Jaimes was very upset, and he told her that nothing happened.

¶ 24    In addition to kissing M.Z. on this day, defendant said there were two prior occasions where he "kissed her on the lips as he grabbed her butt with his hand" and she would tell him not to touch her. During this interview, the detectives obtained written consent to collect a buccal swab from defendant and his cheek was swabbed. A video of the interview was then entered into evidence and published to the jury. On cross-examination, Rodriguez testified that he believed defendant was arrested on November 17, 2018, around 11:00 p.m. and she spoke with him 12 hours later the following morning. The State rested and defendant's motion for a directed verdict was denied.

¶ 25    Defendant testified on his own behalf through an interpreter. He denied ever touching M.Z.'s vagina with his hand, penis, or mouth, or kissing her in a sexual way at any time when she was 4 through 12 years old. He further denied ever taking M.Z. into his bedroom and locking the door.

¶ 26    With respect to the events of November 17, 2018, defendant testified that he arrived at the salon around 9:00 p.m. to find Jaimes working on Camacho's hair. Defendant spoke briefly with Camacho, then went to the back room. He then noticed M.Z. was "a little bothered" as she combed a doll's hair. She said she wanted to go home but Jaimes would not let her leave. Defendant told her to just wait until Jaimes was finished and they would all leave together.

¶ 27    Defendant returned to the back room, and M.Z. soon joined him. She sat on defendant's lap, hugged him, and again asked him to go home. Defendant told her to stay with him until Jaimes was finished, and he gave her a kiss on her neck when he "told her calm down, we will be leaving soon." Defendant denied that the kiss was sexual in nature.

¶ 28    At that point, Jaimes looked through the window and thought he "was doing something with the child." She came into the room and asked defendant what he was doing, and he said "nothing." Jaimes said she saw him raising the zipper of his pants, but defendant stated that was not the case; he had worn a large belt buckle that day and was simply adjusting the buckle. Jaimes and Camacho were upset, so defendant told Camacho not to think he had done anything inappropriate. He went home and the police arrived soon thereafter and arrested him. Defendant denied touching M.Z.'s breasts or vagina with his hand, touching any part of her body with his penis, putting his hand down her pants, or removing her pants or underwear on that night.

¶ 29    Defendant acknowledged that he spoke with the police the following day and the confessions he made. At trial, defendant asserted that these confessions were untrue, and resulted from him lacking sleep, as well as being scared and confused. On cross-examination, defendant testified that he would often comfort M.Z. if she was upset but this was the only time he kissed her neck in an effort to calm her. The defense then rested.

¶ 30    Following closing arguments, the jury found defendant guilty of three counts of predatory criminal sexual assault and two counts of aggravated criminal sexual abuse. The trial court denied defendant's amended motion for a new trial, which notably did not include a challenge to DiDomenic's testimony. The trial court subsequently sentenced defendant to 12 years' imprisonment on each of the three counts of predatory criminal sexual assault, to be served consecutively, and 5 years' imprisonment on each of the two counts of aggravated criminal sexual

abuse counts. One of those was to be served consecutively to the predatory criminal sexual assault counts, for an aggregate sentence of 41 years' imprisonment. Defendant timely appealed.

¶ 31    Defendant contends on appeal that his convictions should be reversed, and he is entitled to a new trial, because his constitutional right to confrontation was violated at trial when "DiDomenic, who did not conduct the DNA laboratory analysis himself, provided surrogate testimony regarding the findings and conclusions of a non-testifying forensic scientist [Kaeshamer] who actually conducted the analysis and authored the DNA report." Conceding that he did not preserve this issue by failing to object at trial or include the issue in his posttrial motion, defendant asks this court to review the matter for plain error. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion).

¶ 32    A defendant has a constitutional right to confront the witnesses against him. U.S. Const., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."). Moreover, in *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the United States Supreme Court held that the confrontation clause prohibits the introduction of any hearsay statements against the accused if they are deemed "testimonial" in nature, unless the declarant is unavailable for trial and the defendant has had a prior opportunity to cross-examine that declarant. However, *Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id.* at 68.

¶ 33    Since *Crawford*, the United States Supreme Court "has, on three subsequent occasions, considered whether scientific reports are testimonial under *Crawford* and subject to the strictures of the confrontation clause." *People v. Barner*, 2015 IL 116949, ¶ 44. These include the decisions issued in *Melendez–Diaz v. Massachusetts*, 557 U.S. 305 (2009), *Bullcoming v. New Mexico*, 564

U.S. 647 (2011), and *Williams v. Illinois*, 567 U.S. 50 (2012). "Each of these opinions was issued by a closely divided Court, and the dissenters from the earlier cases formed the plurality in the latest case." *People v. Lewis*, 2019 IL App (1st) 160864, ¶ 33. Several different relevant standards and tests were proposed in these three cases. Our own supreme court first attempted to resolve the "split of opinion and the confusion" resulting from these three United State Supreme Court decisions in *People v. Leach*, 2012 IL 111534, ¶ 136, and made another attempt in *Barner*, 2015 IL 116949.

¶ 34   On appeal, the State and defendant vigorously dispute whether DiDomenic's testimony regarding the DNA laboratory analysis conducted by Kaeshamer implicated or violated defendant's right to confrontation, considering the various standards and tests that have evolved from the decisions cited above. We need not delve further into these issues to resolve this appeal, however, as defendant cannot demonstrate plain error even if a violation of his right to confrontation is assumed.

¶ 35   The plain-error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error." *People v. Herron*, 215 Ill. 2d 167, 186 (2005). The plain-error doctrine is applied where "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In either circumstance, the burden of persuasion remains with the defendant. *Herron*, 215 Ill. 2d at 182.

¶ 36   Defendant only asserts first-prong plain error on appeal, claiming that "the trial evidence

was sufficiently close that the erroneously admitted DNA evidence provided by Kaeshamer via DiDomenic might have tipped the scales of justice against Aguilar. *** The DNA analysis and conclusion to which DiDomenic improperly testified was the only physical evidence implicating Aguilar in any of the charges lodged against him." We disagree.

¶ 37    First, it is axiomatic that physical evidence is not necessary to prove defendant guilty beyond a reasonable doubt. *People v. Williams*, 182 Ill. 2d 171, 192 (1998). Furthermore, the positive and credible testimony of a single witness is sufficient to sustain a conviction even if the defendant contradicts it. *People v. Harris*, 2018 IL 121932, ¶ 27. Additionally, "[i]t has been observed that 'a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable.' " *People v. Simpson*, 2015 IL 116512, ¶ 36 (quoting P*eople v. R.C.*, 108 Ill. 2d 349, 356 (1985)).

¶ 38    Here, the evidence against defendant included the positive, credible, and consistent testimony of M.Z. as to the events of November 17, 2018, as well as defendant's prior abuse. This testimony was corroborated by her prior consistent statements to Gaudio and Papafino, the testimony of Jaimes that she saw defendant putting his penis back in his pants as she looked into the back room of the salon, and M.Z.'s long history of urinary tract infections. It was also corroborated by defendant's own confession to the police. The only contrary evidence was defendant's recantation at trial. Notwithstanding defendant's recantation, and even without the evidence of defendant's DNA on M.Z.'s neck, we find the evidence of defendant's guilt to be overwhelming.

¶ 39    Furthermore, we also note that if an error is "harmless, it most certainly cannot rise to the level of plain error." *Leach*, 2012 IL 111534, ¶ 141. "In deciding whether an error is harmless, a reviewing court may 'determine whether the improperly admitted evidence is merely cumulative

or duplicates properly admitted evidence.' " *People v. Temple*, 2014 IL App (1st) 111653, ¶ 59, quoting *People v. Becker,* 239 Ill. 2d 215, 240 (2010). The evidence defendant challenges only served to prove that defendant's DNA was found on M.Z.'s neck. However, other properly admitted evidence already established that defendant had kissed M.Z. on the neck. In fact, despite his other recantations at trial defendant admitted on the witness stand that he kissed M.Z. on the neck where his DNA was ultimately found. As such, the DNA evidence was merely cumulative and duplicative of other properly admitted evidence, any possible error in its admission was harmless, and it therefore could not amount to plain error.

¶ 40    Finally, we note again that defendant only asserts first-prong plain error on appeal and has therefore forfeited any claim under the second prong. *Leach*, 2012 IL 111534, ¶ 61 ("If a defendant fails to make a plain-error argument, we generally honor his procedural default"); Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited."). Moreover, even if defendant had raised a second-prong argument, the "second prong of the plain error rule can be invoked 'only in those exceptional circumstances where, despite the absence of objection, application of the rule is necessary to preserve the integrity and reputation of the judicial process.' " *People v. Jackson*, 2022 IL 127256, ¶ 28, quoting *People v. Herrett*, 137 Ill. 2d 195, 214 (1990). Illinois courts have repeatedly concluded that confrontation-clause errors do not satisfy this standard. See *People v. Patterson*, 217 Ill. 2d 407, 424 (2005); *People v. Tucker*, 2022 IL App (1st) 172982, ¶ 67; *People v. Fox*, 2022 IL App (4th) 210262, ¶ 103; *Lewis*, 2019 IL App (1st) 160864, ¶ 53; *People v. Cox*, 2017 IL App (1st) 151536, ¶ 87.

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 42    Affirmed.