2022 IL App (4th) 210262

NO. 4-21-0262

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| DARELLE D. FOX, | ) | No. 17CF970 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Cavanagh and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1       In July 2017, the State charged defendant, Darelle D. Fox, with three counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)), alleging that defendant shot and killed Demesheo Lovelace. In May 2019, defendant was tried by a jury simultaneously with codefendant Joseph Fox (defendant's brother), who was also charged with Lovelace's murder. A jury found defendant guilty of first degree murder and further found that, in the course of the offense, defendant personally discharged a firearm, causing Lovelace's death. In October 2019, the trial court sentenced defendant to 60 years in prison.

¶ 2       Defendant appeals, arguing (1) the trial court should not have admitted cell phone records into evidence as self-authenticating business records because the accompanying certifications did not allege that they were made under oath, (2) defendant did not receive a fair trial when, while being tried jointly with a codefendant, the State elicited nontestifying

codefendant statements that inculpated defendant, (3) the trial court erred by not appointing new counsel when defendant alleged that his trial counsel labored under an actual conflict of interest because counsel previously represented the victim, (4) the trial court conducted an inadequate *Krankel* inquiry into defendant's conflict-of-interest claim, and (5) defendant's trial counsel labored under an actual conflict of interest when, subsequent to the *Krankel* hearing, counsel adopted defendant's *pro se* filing alleging that counsel did not explain the conflict of interest to him so he never knowingly waived it, but then failed to zealously argue his claim at the motion hearing.

¶ 3        We disagree and affirm.

¶ 4                                I. BACKGROUND

¶ 5                                A. The Charges

¶ 6        In July 2017, the State charged defendant with three counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) for the shooting death of Demesheo Lovelace. The charges alleged that defendant personally discharged a firearm at Lovelace, causing his death. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016).

¶ 7                        B. The State's Motion To Admit Cell Phone Records

¶ 8        In May 2019, the State filed a "Motion to Admit Evidence Pursuant to Illinois Rules of Evidence 803(6) and 902(11)." The State alleged that it had received records relevant to "the cell phone activity of multiple witnesses" in response to subpoenas sent to Sprint, T-Mobile, and Verizon. The State attached certifications from Sprint, T-Mobile, and Verizon, which the State alleged "establish[ed] the foundation [for] admission of records pursuant to the business record hearsay exception" and requested the trial court admit the records pursuant to Illinois Rules of Evidence 803(6) and 902(11) (eff. Sept. 28, 2018) "in lieu of the live testimony of business records

custodians from each of the respective companies."

¶ 9 Later that same month, the trial court conducted a hearing on the State's motion. Defendant objected to the motion, arguing that the certifications offered by the State failed to meet the foundational requirements for computer-generated records. The court agreed with defendant, finding that the certifications met the foundational requirements for business records but not computer-generated records. The court suggested that, if the State obtained new certifications with the additional necessary foundation, defendant would not be caught by surprise.

¶ 10 The following day, the State submitted to the trial court new certifications with the additional foundation for computer-generated records. Each of the five certifications contained identical language, except for the (1) name of the service provider, (2) name of the custodian of records executing the certification, and (3) phone number or account to which the certification applied. For example, the Verizon certification stated, in relevant part, as follows:

> "I hereby certify that the records attached hereto:
>
> 1. Were made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters, and
>
> 2. Were kept in the court [*sic*] of the regularly conducted business activity; and
>
> 3. Were made by the regularly conducted business activity as a regular practice; and
>
> 4. If record is not the original, such record is a true and accurate duplicate of the original; and
>
> 5. In making the records:

a. Standard equipment was used; and

b. The particular computer generates accurate records when used appropriately; and

c. The computer was used appropriately; and

d. The sources of information, the method of recording, and the time of preparation indicate that the record is trustworthy and should be admitted into evidence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 5/20/19

/s/ Kelsey Lucas

Kelsey Lucas

Subpoena Compliance Analyst

Verizon."

¶ 11      Defendant objected to the new certifications, arguing that, although the additional foundational language for computer-generated records was added, "this is just a superficial addition that's been made to comply with the language" and that the "spirit" of Rule 902(11) "that they were actually reviewed for their accuracy *** and provided in compliance with the rule has not been achieved."

¶ 12      The prosecutor responded as follows:

"[I can] assure the Court in speaking to [the witnesses signing the certifications] late last night and this morning, they are reviewing the records to make sure that they are what they say they were because they are signing a certification under

penalty of perjury. *** These are law enforcement compliance analysts that know what they're doing and are signing certifications under penalty of perjury."

¶ 13    The trial court found that the certifications "now compl[y]" and allowed the State's motion to admit the cell phone records as self-authenticating business records under Rules 803(6) and 902(11). Ill. Rs. Evid. 803(6), 902(11) (eff. Sept. 28, 2018).

¶ 14                            B. The Jury Trial

¶ 15    In May 2019, defendant was tried jointly with codefendant Joseph Fox (defendant's brother), whom the State also charged with first degree murder (while armed with a firearm). A third defendant, Shawn Eubanks, was tried separately.

¶ 16                            1. *The State's Evidence*

¶ 17                            a. The Shooting

¶ 18    The State called multiple law enforcement witnesses whose testimony established, generally, that around 4:30 p.m. on July 2, 2017, members of the Decatur Police Department were called to Ashley Wheeler's home at 1011 South Water Street, Decatur, Illinois, for a report of shots fired. Upon their arrival, they found Lovelace lying in a nearby tree line with gunshot wounds to his head. Wheeler was very emotional and told the police that Lovelace had been shot dead. She identified defendant, Joseph, and Eubanks by name as the perpetrators.

¶ 19    Wheeler's silver Hyundai was in front of her house with the windows shot out. Police collected (1) multiple fired .380-caliber casings from around the Hyundai, (2) two fired .40-caliber Smith & Wesson casings near Lovelace's body, and (3) a black baseball cap with a logo for the "Golden State Warriors" from Wheeler's yard.

¶ 20    A forensic pathologist testified that Lovelace suffered 10 different gunshot wounds, with 3 of the gunshots being fired into Lovelace's head in rapid succession. The pathologist

recovered four projectiles from Lovelace's body and delivered them to the Decatur police.

¶ 21                              i. *Ashley Wheeler*

¶ 22          Ashley Wheeler testified that she lived at 1011 South Water Street and had a child in common with Lovelace. She stated that, on the day of the shooting, she was at home with Lovelace. Around 4:30 p.m., Lovelace walked out the front door, and Wheeler heard gunshots. She looked outside and saw defendant "running after my baby daddy, shooting towards my baby daddy."

¶ 23          Wheeler testified that "the shooters" had arrived in a dark van that pulled in front of her house. Wheeler testified that she saw Joseph driving the van and Eubanks shooting at her Hyundai from the open sliding passenger door of the van. She stated that, while Eubanks was shooting at her car, defendant was outside the van chasing Lovelace and shooting at him. Wheeler called 911. When the police arrived, she pointed them to a black hat in her yard that she said "flew right off [defendant's] head." Wheeler testified that she had known (1) defendant for "some years" because he was dating her aunt, (2) Joseph since high school, and (3) Eubanks her whole life because he was her cousin. Wheeler also identified defendant and Joseph in open court.

¶ 24                              ii. *Tyrene Green*

¶ 25          Tyrene Green testified he had planned to meet Lovelace at around 4:30 p.m. the day of the shooting. When Green arrived on Water Street, he called Lovelace to tell him he was outside the home and waited in his car. About five minutes later, Green looked up from his phone and saw Lovelace walking toward him. Green then heard two gunshots. Green looked in his rearview mirror and saw a blue van with the sliding door open. Green then saw another man outside of the van shooting a gun and running after Lovelace. Shortly thereafter, Green went to look for Lovelace and found his body near the wood line. Green testified that the police then "rolled up"

and "frisked" him.

¶ 26    Green testified that the person chasing Lovelace was wearing a black hat. Green also testified that, after the shooting, Wheeler came out of the house and screamed, "Darelle [(defendant)] pulled up to my house and shoot [*sic*] my baby daddy!"

¶ 27    iii. *Joseph Hamm and Connie Magoulias*

¶ 28    Joseph Hamm and Connie Magoulias were civilian witnesses who had no connection to any of the people involved in the shooting. Hamm was at a nearby apartment building when he heard what he thought were fireworks and then saw two black males running northbound on Route 51. He then heard another set of gunshots and saw a dark van driving the same direction the runners had run. The van was travelling the wrong way on Route 51. (We note Route 51 runs parallel to the tree line where Lovelace's body was found.)

¶ 29    Magoulias testified that she was driving home southbound on Route 51 when she approached a dark Dodge Caravan coming toward her in her lane. The van made a U-turn, and a man ran from the tree line and jumped in the van. The van then headed southbound down Route 51, the same direction that Magoulias was headed. She took down the license plate number of the van and called 911 because "the incident looked so unusual."

¶ 30    b. The Aftermath and Investigation

¶ 31    i. *John Gambrill*

¶ 32    John Gambrill, the chief of the Harristown Fire Department, testified that on July 2, 2017, at 9:44 p.m. he was alerted to a vehicle fire and arrived to find a van on the side of the road engulfed in flames. Firefighters extinguished the flames and reported the license plate number to Macon County dispatch. Gambrill left the van in the custody of the police.

¶ 33    ii. *Jodie Head*

¶ 34 Jodie Head testified that she was the owner of the dark blue Dodge Caravan, which was a vehicle that she used for her cleaning business. She had loaned the Caravan to one of her employees, Stephanie Babb, at the end of June 2017 because Babb's car was being repaired.

¶ 35                                        iii. *Stephanie Babb*

¶ 36 Babb testified that she was engaged to defendant at the time of Lovelace's shooting. In June 2017, Babb borrowed the blue Dodge Caravan from Head. Babb stated that she borrowed the van because, on June 27, 2017, her car was struck by another car. Babb was not present, but defendant called to tell her that a dark car "came flying around the corner" and sideswiped her car. Babb made a police report. About a week later, sometime before July 2, she asked defendant who hit her car because she "just knew that he knew." Defendant then told her that Lovelace had hit her car.

¶ 37 After borrowing the Dodge Caravan from Head, Babb obtained a rental, a silver Chevy Cruze. Babb did not return the Caravan to Head, but instead Babb and defendant continued to drive both vehicles. During this time period, Babb lived at 2660 Forest Crest Parkway in Decatur, and defendant lived "on King Street."

¶ 38 Babb testified that, on the afternoon of July 2, 2017, she was at defendant's house doing chores when, at 4:37 p.m., defendant called Babb and told her to come to her house. She drove to her home in the Cruze. She arrived at her house about five minutes later and saw the Caravan parked in her driveway. Babb testified that she went inside and found defendant, Joseph, and Eubanks in her living room. Defendant was pacing in the kitchen, Joseph was listening to the police scanner on the table, and Eubanks was watching the news. Babb testified that she knew something was "off" because it was not normal for Joseph or Eubanks to be at her house. Babb noticed two guns on the kitchen counter when she walked in. The following exchange occurred

between the prosecutor and Babb:

> "Q. [A]t that point are they saying anything? What's going on between the three of them?
>
> A. They were conversating amongst each other. I mean, I don't really remember what was said or who said what, but they were just listening to the scanner. And then some names would come across and then they would start talking and um—it's really—
>
> Q. Do you remember if they said anything about any of the people's names who came across the scanner?
>
> A. Yes. I don't remember the name but I remember that someone's name had come across and I remember when [*sic*] one of them saying there's no way she would have seen. There's no way. Like, and then said that they needed to call somebody."

¶ 39    Defendant told Babb to drive back into town and buy lighter fluid. Babb bought lighter fluid at the Dollar General, returned to her home, and at defendant's direction, burned bags containing shoes and clothing in her backyard.

¶ 40    Defendant, Joseph, and Eubanks left in the Cruze. Later, defendant called Babb and told her to bring the Caravan to a bar where he would meet her. While she waited at the bar, defendant repeatedly called her saying he was on his way. Defendant arrived in the Cruze and told Babb to follow him in the Caravan. She followed defendant to the Rock Springs Conservation Area. After they arrived at Rock Springs, she walked toward defendant in the Cruze and saw a man named "Black" (later identified as Joseph Hughes) get out of the Cruze with a gas can and get into the Caravan. Babb got into the Cruze with defendant, Joseph, and Eubanks. Babb testified

that everyone was communicating via cell phone as the two vehicles drove to a dead-end road. At the dead end, Hughes parked the Caravan, poured gas all over it, and "caught it on fire." They all left together in the Cruze.

¶ 41 Babb testified that she stayed in communication with defendant via cell phone until he was arrested on July 9, 2017. When asked about the last communication she received from defendant, Babb answered that, on July 9, "he texted me and he said it was over."

¶ 42 Babb further testified that she was arrested on July 10, 2017. She later spoke with the police under an immunity agreement and provided a detailed statement consistent with her testimony. She also rode with the detectives to show them the routes she could remember driving on July 2.

¶ 43 Babb also testified that she was shown a picture of the black ball cap recovered from Wheeler's yard. She identified it as one she had previously seen defendant wear. She also testified that, on July 2, 2017, she did not own a gun or a gun magazine.

¶ 44                              iv. *Iesha Ballard*

¶ 45 Iesha Ballard testified that defendant and Joseph were her cousins. On July 9, 2017, Ballard was at her uncle's house in Decatur. Defendant, Joseph, and Eubanks were also there. Ballard was sitting on the front porch with Joseph when she saw "[police] coming from the side of the house with guns." Joseph ran into the house, and Ballard followed him. The prosecutor asked Ballard, "After you ran in the house, did you hear Joseph, [defendant], or [Eubanks] say anything?" Ballard answered, "I heard one of them saying 'they got us', like they was going to jail." On cross-examination, defendant asked Ballard who said "they got us," and Ballard answered that she was not sure.

¶ 46                          v. *Eric Ethell and Brad Hall*

¶ 47 Members of the Decatur Police Department executed a search warrant for Babb's residence on July 20, 2017, and testified about physical evidence they recovered there. Officer Eric Ethell discovered a burn pile in Babb's backyard and a bottle of lighter fluid behind her garage. Detective Brad Hall recovered from Babb's residence a magazine for a .40-caliber handgun that contained three to five Federal brand .40-caliber Smith & Wesson rounds.

¶ 48 vi. *David Dailey*

¶ 49 David Dailey testified that he was a detective with the Decatur Police Department. His duties included "obtaining and analyzing call detail records or CDR's obtained from service providers such as Verizon or Sprint." Dailey testified regarding his training and experience relating to those duties. The State tendered Dailey as an expert in "call detail record analysis." Without objection, the court accepted Dailey as an expert witness in that area.

¶ 50 The State then questioned Dailey about the Sprint, Verizon, and T-Mobile cell phone records the State had subpoenaed. Dailey testified that he examined two sets of Sprint records—one associated with defendant's phone number and one associated with Hughes's phone number. Dailey also examined two sets of T-Mobile records—one associated with Joseph's phone number and the other associated with Eubanks. Daily also examined the Verizon records associated with Babb's phone number.

¶ 51 Dailey testified that defendant's phone communicated with Joseph's phone twice on July 2, 2017 (at 12:52 p.m. and at 1:12 p.m.). Defendant's phone did not communicate with Eubanks's phone or Hughes's phone that day. Joseph's phone did not communicate with Eubanks's phone on July 2, 2017. Hughes's phone communicated with Joseph's phone 51 times between 4:46 p.m. on July 2, 2017, and 8:36 a.m. on July 3, 2017. Dailey found no communication between Hughes's phone and Eubanks's phone.

¶ 52          The State asked Dailey if he was able to determine whether the phones of defendant, Joseph, and Eubanks were communicating "at or around the time of the 911 call [at 4:31 p.m.]." Dailey testified that defendant's phone placed an outgoing call to an unidentified number at 4:18 p.m. for 3 seconds and an outgoing call to Babb's phone at 4:36 p.m. for 35 seconds. Dailey testified that Eubanks's phone placed an outgoing call to an unidentified number at 4:24 p.m. for 32 seconds and an outgoing call to Elijah Fox (defendant's other brother) at 4:42 p.m. for 12 seconds. Dailey testified that Joseph's phone received an incoming call from an unidentified number at 3:37 p.m. for 532 seconds, then placed an outgoing call to Hughes's phone at 4:46 p.m.

¶ 53          Dailey then utilized various maps he created to illustrate, for certain phone calls, the location and direction of the cell tower sector utilized for that call in relation to a location important to the investigation, such as the location of Lovelace's body or the van fire. The maps did not pinpoint a location from which a call was made but instead illustrated that the location of the cell tower and sector direction used for a particular call was consistent with the phone being in the general area of one of the locations important to the investigation at a particular time. Verizon records for Babb's phone estimated the location of her phone at the time of certain calls based upon the time it took for the signal to travel from the tower to the phone, but Dailey explained it was just Verizon's "best guess" and was not based upon GPS or satellite data. Dailey's examination of the cell phone records largely corroborated Babb's testimony about her own movements and those she witnessed of defendant, Joseph, Eubanks, and Hughes.

¶ 54          Dailey also testified that on July 17, 2017, he collected surveillance video from Dollar General showing Babb buying lighter fluid on July 2, 2017. Dailey further stated that on July 27, 2017, he drove with Babb and she showed him the various routes she had driven on July 2. He also reviewed surveillance footage that showed a light-colored compact car followed by a

dark minivan driving on Rock Springs Road on July 2 at 9:14 p.m.

¶ 55    On cross-examination, Dailey testified that a cell phone does not necessarily connect to the closest tower but instead to the tower that provides the clearest and strongest signal. Dailey also explained that the records tell him only who a device is registered to, not who is in possession of a device when it is used. He also testified that he cannot establish the geographical area a particular sector covers or where a device is located within that sector. Dailey testified that he was not able to say at any given time that defendant was at any specific location with his phone. Dailey also agreed that defendant lives in Decatur and has family in Decatur; thus, he could have "just [as] easily" been at a home or other location covered by the same tower sector as the location involved in the crime.

¶ 56    c. Scientific Witnesses

¶ 57    A forensic scientist specializing in firearms examination testified that the two .40-caliber fired casings recovered from near Lovelace's body were both fired from the same firearm. The scientist also examined the projectiles recovered from Lovelace's body and determined that three of the projectiles were .40-caliber and were fired from the same firearm. The remainder were fragments.

¶ 58    A forensic scientist specializing in DNA analysis testified that she examined the black hat found in Wheeler's yard and concluded that defendant was included as a contributor to the major male DNA profile identified on the hat by a statistical probability of 1 in 1.9 billion unrelated males. Joseph and Eubanks were excluded as contributors.

¶ 59    2. *Defendants' Evidence and Verdict*

¶ 60    Neither defendant nor Joseph presented any evidence. The jury found defendant guilty of first degree murder and found that he personally discharged a firearm that proximately

- 13 -

caused the death of Lovelace. The jury found Joseph guilty of first degree murder and found that the State did not prove he was armed with a firearm.

¶ 61                                     D. Posttrial Proceedings

¶ 62        In June 2019, defendant, through counsel, filed a motion for new trial arguing that the evidence was insufficient to sustain the jury's verdict. Defendant also alleged that the trial court erred by allowing the State's motion to admit the cell phone records.

¶ 63        In August 2019, defendant *pro se* filed a "Motion to Dismiss Trial Counsel" that contained six different allegations. Defendant first claimed that a "conflict of interest had occurred when my trial counsel knew she had represented the victim in this case and failed to remove [herself as] counsel." Defendant's remaining claims alleged various trial errors that he contended constituted ineffective assistance.

¶ 64        In September 2019, the trial court conducted a *Krankel* hearing on defendant's motion to dismiss trial counsel. The court first addressed defendant, noting that he made six allegations in his motion and asking defendant to address each one individually. The following exchange ensued.

> "THE COURT: [T]he first statement that you have made [in your motion] is that there's a conflict of interest that had occurred when your trial counsel knew she had represented the victim in the case and failed to remove herself from that. *** Is there anything you'd like to state further than what's in the allegation?
>
> DEFENDANT: No.
>
> THE COURT: Okay. [Defense counsel], would you like to comment on the first one?
>
> [DEFENDANT'S COUNSEL]: Well, the only comment that I would make,

Judge, is that I did represent Demesheo Lovelace several years prior to this incident. I advised [defendant] that I represented him and it was um—discussed many times in meetings with [defendant]. He never raised an objection. And I told him that, in my opinion, no conflict exists because Mr. Lovelace was dead. So, the very nature of the conflict is that information learned from prior representation could um—[affect] or diminish the representation of the current defendant. And, obviously, there was nothing that I had learned that I could have used in this case."

¶ 65 The trial court followed the same pattern regarding the remainder of defendant's *pro se* allegations, asking defendant to address each one individually, then allowing defense counsel to respond. Defendant's conflict-of-interest claim was the only one defendant did not elaborate on when given the opportunity. At the conclusion of the inquiry, the court ruled as follows.

"I have listened to the six allegations that [defendant] has made. I've listened to [defense counsel's] responses to the six allegations. [Defendant], we've made a good record of what your complaints are.

First of all, as I look at the first allegation, the conflict of interest. I understand what you've raised. [Defense counsel] has stated that she did inform you that she did represent [Lovelace] in the past. Since he had passed away, at this stage, I do not find that it is a conflict.

* * *

As I look at the six allegations that you have made in this, I do find that the claims in this matter lack merit. They pertain only to matters of trial strategy. So, I do not see the need to appoint new counsel in this. I am denying your motion to

dismiss trial counsel."

¶ 66    Later in September 2019, defendant *pro se* filed a "Motion for a Judgment of Acquittal" alleging that (1) the evidence was insufficient to sustain his conviction, (2) Wheeler's identification was unreliable, (3) the State committed misconduct in closing arguments and (4) "the State's D.N.A. expert was flawed." Defendant attached to his motion an "Affidavit of Truth" in which he claimed that he "did not give consent after conflict of interest first accrued." Defendant asserted that he did not understand what a conflict of interest was or know his rights "under the conflict of interest law."

¶ 67    In October 2019, the trial court conducted a hearing on defendant's motion for a new trial. Defendant's counsel acknowledged defendant's *pro se* "motion for a judgment of acquittal" and commented that it was "substantially similar" to her motion so she would "just adopt what he filed and make that part of mine." The court ruled that counsel had adopted defendant's *pro se* motion. During her argument, defendant's counsel addressed only the cell phone certifications and the sufficiency of the evidence. She ended her argument by referring to and resting upon the allegations and argument in the written motions.

¶ 68    The trial court denied defendant's posttrial motions and proceeded to a sentencing hearing. The court sentenced defendant to a total of 60 years in prison, consisting of 35 years for first degree murder plus a 25-year mandatory firearm enhancement.

¶ 69    This appeal followed.

¶ 70                                    II. ANALYSIS

¶ 71    Defendant appeals, arguing (1) the trial court erred by admitting cell phone records into evidence as self-authenticating business records because the accompanying certifications did not allege that they were made under oath, (2) defendant did not receive a fair trial when, while

- 16 -

being tried jointly with a codefendant, the State elicited nontestifying codefendant statements that inculpated defendant, (3) the trial court erred by not appointing new counsel when defendant alleged that his trial counsel labored under an actual conflict of interest because counsel previously represented the victim, (4) the trial court conducted an inadequate *Krankel* inquiry into defendant's conflict-of-interest claim, and (5) defendant's trial counsel labored under an actual conflict of interest when, subsequent to the *Krankel* hearing, counsel adopted defendant's *pro se* filing alleging that counsel did not explain the conflict of interest to him so he never knowingly waived it, but then failed to zealously argue his claim at the motion hearing.

¶ 72        We disagree and affirm.

¶ 73                            A. The Admission of the Cell Phone Records

¶ 74        Defendant first argues that the trial court erred by admitting the cell phone records as self-authenticating business records pursuant to Illinois Rules of Evidence 803(6) and 902(11) (eff. Sept. 28, 2018) because the certifications accompanying the records failed to comply with the requirement of Rule 902(11) that they be made "under oath subject to the penalty of perjury." Ill. R. Evid. 902(11) (Sept. 28, 2018). Defendant contends that, although the certifications were declared "under penalty of perjury," they did not also establish that they were made "under oath."

¶ 75                            1. *The Applicable Law*

¶ 76        Rule 902(11) states as follows.

            "Extrinsic evidence of authenticity as a condition precedent to admissibility
        is not required with respect to the following:

                                      * * *

            (11) Certified Records of Regularly Conducted Activity. The original or a
        duplicate of a record of regularly conducted activity that would be admissible under

Rule 803(6) if accompanied by a written certification of its custodian or other qualified person that the record

> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters;

> (B) was kept in the course of the regularly conducted activity; and

> (C) was made by the regularly conducted activity as a regular practice.

The word 'certification' as used in this subsection means with respect to a domestic record, a written declaration under oath subject to the penalty of perjury \*\*\*." *Id.*

¶ 77 Ordinarily, a trial court's ruling regarding the admissibility of evidence is reviewed for an abuse of discretion. *People v. Cross*, 2021 IL App (4th) 190114, ¶ 126, 184 N.E.3d 582, 602. However, the proper interpretation of Rule 902(11) is a question of law that is reviewed *de novo*. *People v. Risper*, 2015 IL App (1st) 130993, ¶ 33, 34 N.E.3d 627 ("[When] the only issue for the reviewing court is the correctness of the trial court's legal interpretation, *de novo* review is appropriate.").

¶ 78 2. *The Certifications Did Not Indicate They Were Made "Under Oath"*

¶ 79 The five certifications at issue in this case—two from Sprint, two from T-Mobile, and one from Verizon—were prepared by the State and, as such, were identical in form and substance, except for the name of the service provider, certifying analyst, and case number/phone number to which each certification pertained. Each certification contained the same language setting forth the requirements for admissibility as business records under Rule 803(6). Each certification also stated, "I declare under penalty of perjury the foregoing is true and correct,"

followed by the date of execution of the certification, name, electronic signature, and job title of the signatory.

¶ 80        The parties do not dispute that the certifications satisfied the criteria for admissibility as business records under Rule 803(6), but the parties disagree whether the certifications qualify under Rule 902(11) as "written declaration[s] under oath subject to the penalty of perjury." Ill. R. Evid. 902(11) (Sept. 28, 2018). Defendant contends they do not satisfy Rule 902(11) because they state only that they were made under penalty of perjury and do not also establish that they were made under oath. The State responds that the plain language of the rule "does not require that the written certificate *state* it was made under oath" (emphasis in original) and that, "by stating in writing that the statements made in their certificates are true and correct under penalty of perjury, the custodians [of record] are indicating their certificates are made under oath."

¶ 81        The language of Rule 902(11) could not be more clear: a "certification" that passes muster under the rule is "a written declaration under oath subject to the penalty of perjury." *Id.* The rule requires a certification be made under oath. There is nothing on the face of the certificates at issue in this case to indicate they were made under oath.

¶ 82        Moreover, the State itself drafted the certificates at issue. The State, presumably, was aware of Rule 902(11) and chose to include that the certificates were made "under penalty of perjury" but omitted that they were made "under oath." Had the State simply included the words "under oath" in its certificate, defendant would have had no basis on which to complain on appeal. Accordingly, we conclude the trial court erred by finding the certificates accompanying the cell phone records in this case complied with the requirements of Rule 902(11).

¶ 83        3. *The Trial Court's Error Regarding Rule 902(11) Was Harmless*

¶ 84    Although the trial court erred by finding the certificates complied with Rule 902(11), the admission of the cell phone records pursuant to those certifications in this case was harmless error. An evidentiary error, as opposed to a constitutional error, is harmless "where there is no *reasonable probability* that the jury would have acquitted the defendant absent the error." (Emphasis in original and internal quotation marks omitted.) *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104, 5 N.E.3d 328.

¶ 85    In this case, there is no reasonable probability that the jury would have acquitted defendant had the trial court excluded the cell phone records. The remaining evidence of defendant's guilt is overwhelming.

¶ 86    Wheeler testified that she saw defendant chasing Lovelace and shooting at him. Although some eyewitness identifications may be subject to doubt when the witness does not know the offender, in this case, Wheeler had known defendant for years because he had dated her aunt. She identified defendant as the shooter to the police in the immediate aftermath of the shooting, again during a stationhouse interview, and again at trial. Defendant presents no evidence that Wheeler's identification of him as the person who shot and killed Lovelace was motivated by any sort of bias. Moreover, Wheeler's identification was corroborated by other evidence.

¶ 87    Perhaps the strongest corroboration comes from Babb, who was defendant's own girlfriend at the time of the shooting. Babb's testimony picked up where Wheeler's left off— namely, the minutes and hours after Lovelace's murder. Babb testified that she was called to defendant's home immediately after the shooting. Defendant was there with Joseph and Eubanks— the two codefendants that Wheeler had also identified and had known for many years. Two guns were on the kitchen counter, and the trio was listening to a police scanner. Importantly, Babb testified that defendant had the blue Dodge Caravan that Babb had borrowed from Head—the same

Caravan in which Wheeler and Green placed defendant at the time of the shooting.

¶ 88    Babb described in detail the steps she took, at defendant's direction, to destroy clothing and the Dodge Caravan. Her testimony was, in turn, corroborated by (1) the Dollar General surveillance video, (2) the Rock Springs Road surveillance video, and (3) the discovery by the police of (a) the burn pile in her back yard, (b) the lighter fluid, and (c) the burned-out Caravan. Additionally, Babb testified that she purchased two TracFones to communicate with defendant after the shooting. Detectives recovered receipts that corroborated those purchases on the dates and times that Babb had provided to them. Additionally, Head testified in detail about her interactions with Babb on July 2 and 3, 2017. Head's testimony also corroborated Babb's time line of her movements. Moreover, Hamm and Magoulias's testimony placed the Dodge Caravan at the time and place of the murder and in the custody of two or more males, as Wheeler and Green described.

¶ 89    Physical evidence also points to defendant's guilt. First, the black hat found in Wheeler's yard in the immediate aftermath of the shooting contained a major male DNA profile of which defendant was included as a contributor by a statistical probability of 1 in 1.9 billion unrelated males. Babb was shown a picture of the hat and confirmed it was a hat she had previously seen defendant wear. Additionally, the projectiles that killed Lovelace were .40-caliber rounds. Fired casings recovered near his body were .40-caliber Federal brand Smith & Wesson rounds. Police recovered a magazine containing .40-caliber Federal brand Smith & Wesson rounds at Babb's home. Babb, who was engaged to defendant, did not own the magazine or rounds.

¶ 90    Defendant overstates the importance of the cell phone evidence, which served primarily to corroborate Babb's testimony. That is to say, the majority of the cell phone evidence reiterated evidence the jury had already heard through Babb—namely, Babb's detailed testimony

about her, defendant's, Joseph's, Eubanks's, and Hughes's movements and communications in the hours and days following the shooting. Dailey emphasized that he could not testify that any person was in any location at any given time because the cell phone records did not (and could not) tell him who was in possession of a particular device. He also testified that he was unable to identify the geographic area a tower sector covered or pinpoint where in a particular sector a cellular device was located when communicating with the tower. Dailey also testified on cross-examination that a cellular device does not necessarily communicate with the closest tower.

¶ 91       Accordingly, we conclude that if the jury had not heard the cell phone evidence, there is no reasonable probability based on the remainder of the evidence that the jury would have acquitted defendant. Accordingly, the trial court's admission of the cell phone records based upon its erroneous finding that the certifications were proper under Rule 902(11) was harmless error.

¶ 92                    B. Non-Testifying Codefendant Statements

¶ 93       Defendant also argues that he was denied his confrontation clause rights when the State elicited testimony from Babb and Ballard that contained inculpatory statements of non-testifying codefendants. The statements defendant challenges are (1) Babb's testimony that she heard one of the three codefendants say, "there's no way she would have seen. There's no way" and (2) Ballard's testimony that she heard one of the three codefendants say "they got us."

¶ 94       The State argues, and defendant concedes, that this claim is forfeited because defendant failed to object at trial or raise the claim in a posttrial motion. We conclude that the plain-error doctrine does not apply to excuse defendant's forfeiture.

¶ 95                             1. *The Applicable Law*

¶ 96       The admission of a confession or admission by a nontestifying codefendant that inculpates a defendant violates the confrontation clause of the sixth amendment. *Bruton v. United*

*States*, 391 U.S. 123, 125 (1968); *People v. Williams*, 182 Ill. 2d 171, 184-85, 695 N.E.2d 380 (1998).

¶ 97        To preserve an error for review, a defendant must both object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. The failure to do either results in forfeiture. *Id.*

¶ 98        A reviewing court may consider a forfeited error under the plain-error doctrine when a clear or obvious error occurred and (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007).

¶ 99        The defendant bears the burden of establishing plain error. *People v. Kitch*, 239 Ill. 2d 452, 461, 942 N.E.2d 1235, 1241 (2011). "If the defendant fails to meet his burden, the issue is forfeited, and [we] will honor the procedural default." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 75, 115 N.E.3d 1148.

¶ 100                              2. *This Case*

¶ 101        In this case, defendant can never establish first-prong plain error because the evidence was not closely balanced. To the contrary, as we earlier discussed (*supra* ¶¶ 83-91), the evidence of defendant's guilt was overwhelming. The statements defendant challenges were vague, unattributed to a specific defendant, and of minimal value to the State's case, particularly when compared against Wheeler's eyewitness testimony (which was corroborated by independent eyewitnesses), Babb's testimony (which corroborated Wheeler's identification), and the DNA evidence placing defendant at the scene of the crime.

¶ 102　　　　Defendant also cannot establish second-prong plain error. Second-prong plain error has been equated with "structural error," which is error that "necessarily renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence." *People v. Moon*, 2022 IL 125959, ¶ 28. Illinois courts look to the type of errors the United States Supreme Court has identified as structural to determine whether the error being considered is comparable. *Id.* ¶ 30. The Supreme Court has recognized errors as "structural" only in a " 'very limited class of cases' " (*id.* ¶ 28 (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)), including "a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction." *Id.* ¶ 29 (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006)). "[T]hese errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence…and no criminal punishment may be regarded as fundamentally fair." *Neder v. United States*, 527 U.S. 1, 8-9 (1999) (quoting *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)).

¶ 103　　　　"Confrontation clause violations *** are not 'structural defects in the constitution of the trial mechanism' that affect '[t]he entire conduct of the trial from beginning to end.' " *People v. Patterson*, 217 Ill. 2d 407, 424, 841 N.E.2d 889, 900 (2005) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). In *Patterson*, the Illinois Supreme Court held that the improper admission of a nontestifying codefendant's grand jury testimony that inculpated the defendant was not structural error but, instead, a mere "trial error" that occurred during the presentation of the case to the jury. *Id.* at 424-25. Similarly, here, even if Babb's and Ballard's testimony constituted a confrontation clause violation, the error would not be structural error subject to second-prong plain error review.

¶ 104 Moreover, even if a confrontation clause violation was appropriate for second-prong plain-error review, the statements at issue in this case do not implicate the confrontation clause. "In *Crawford*, the United States Supreme Court held that a defendant's sixth amendment confrontation rights are implicated at trial if the State seeks to admit into evidence statements that are *'testimonial.'* " (Emphasis added.) *People v. Hood*, 2016 IL 118581, ¶ 20, 67 N.E.3d 213. "In general, a statement is testimonial if the declarant is acting in a manner analogous to a witness at trial, describing or giving information regarding events that have already occurred." *People v. Sutton*, 233 Ill. 2d 89, 111, 908 N.E.2d 50, 64 (2009). The United States Supreme Court in *Crawford* stated that "[t]estimony *** is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." (Internal quotation marks omitted.) *Crawford v. Washington*, 541 U.S. 36, 51 (2004). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.*

¶ 105 In the present case, the vague, unattributed statements overheard by Babb and Ballard—"there's no way she would have seen. There's no way" and "They got us"—are simply not testimonial statements to which the confrontation clause applies.

¶ 106 This court examined the same "they got us" statement contained within Ballard's testimony when affirming Joseph's conviction and determined it would meet one of several recognized hearsay exceptions regardless of who uttered it. *People v. Fox*, 2021 IL App (4th) 190569-U, ¶ 27. One such exception was the excited utterance hearsay exception. *Id.* ¶ 26 ("A statement is admissible as an excited utterance where it relat[es] to a startling event or condition and is made while the declarant was under the stress of excitement caused by the event or condition." (Internal quotation marks omitted.)).

¶ 107　　　　We adopt the analysis and reasoning of our earlier decision and conclude that both statements at issue here would qualify as admissible excited utterances, regardless of the declarant. "They got us" was uttered as the police were descending upon the trio of defendants to arrest them for Lovelace's murder. "[T]here's no way she would have seen. There's no way" was uttered in the immediate aftermath of an ambush assassination while the three perpetrators were huddled around a police scanner and hearing for the first time that there may have been an eyewitness.

¶ 108　　　　For all the above reasons, defendant cannot establish first- or second-prong plain error, and we honor defendant's forfeiture.

¶ 109　　　　　　　　　　C. Trial Counsel's Alleged Conflict of Interest

¶ 110　　　　Defendant also argues that the trial court erred by denying defendant's motion to dismiss counsel because defendant established that his trial counsel labored under an actual conflict of interest because she previously represented Lovelace. Alternatively, defendant argues that the court conducted an inadequate *Krankel* inquiry into defendant's conflict of interest claim.

¶ 111　　　　　　　　　　　　1. *The Applicable Law*

¶ 112　　　　　　　　　　　　a. Conflicts of Interest

¶ 113　　　　"A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Yost*, 2021 IL 126187, ¶ 36, 184 N.E.3d 269. "Illinois law recognizes two types of conflict of interest—actual and *per se*." *Id.* ¶ 37.

¶ 114　　　　A *per se* conflict of interest exists when specific facts about the defense attorney's status, by themselves, create a disabling conflict. *Id.* ¶ 39. Only three categories of *per se* conflict of interest are recognized under Illinois law: "(1) when defense counsel has a contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) when defense counsel contemporaneously represents a prosecution witness; and (3) when defense

- 26 -

counsel was a former prosecutor who was personally involved in the prosecution of the defendant." *Id.* ¶ 66.

¶ 115 "If an alleged conflict of interest does not fit into one of these *per se* conflict categories, a defendant may still assert a claim of *actual* conflict of interest." (Emphasis added.) *Id.*

¶ 116 "To establish an actual conflict of interest, a defendant must identify an actual conflict that adversely affected his counsel's performance." *Id.* ¶ 38. "The defendant is required to identify a specific deficiency in his counsel's strategy, tactics, or decision making that is attributable to the alleged conflict." *Id.* "Speculative allegations and conclusory statements are insufficient to establish an actual conflict of interest." *Id.*

¶ 117                                   b. *Krankel*

¶ 118 "A conflict-of-interest claim is a specific form of an ineffective assistance claim." *In re Br. M.*, 2021 IL 125969, ¶ 44, 182 N.E.3d 693. "Essentially, the party asserting such a claim is arguing that a conflict rendered the attorney's performance substandard and that the substandard performance caused prejudice." *Id.*

¶ 119 "A *pro se* posttrial motion alleging ineffective assistance of counsel is governed by the common-law procedure developed by [the Illinois Supreme Court] in [*People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)], ***." *People v. Roddis*, 2020 IL 124352, ¶ 34, 161 N.E.3d 173. When a defendant makes a posttrial claim of ineffective assistance of counsel, "the court should first examine the factual basis of the defendant's claim." *Id.* ¶ 35. "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel ***." *Id.* "However, if the allegations show possible neglect of the case, new counsel should be appointed." *Id.*

¶ 120 "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 78, 797 N.E.2d 631, 638 (2003). "During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Id.* "Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant' s allegations." *Id.* "A brief discussion between the trial court and the defendant may be sufficient." *Id.* "Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79.

¶ 121 The issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*. *Roddis*, 2020 IL 124352, ¶ 33. When a trial court has properly conducted a *Krankel* hearing, a reviewing court will review the trial court's determination that a defendant's claim does not demonstrate a possible neglect of the case by asking if that decision is manifestly erroneous. *People v. Lawson*, 2019 IL App (4th) 180452, ¶ 43, 139 N.E.3d 663. "A decision is manifestly erroneous 'when the opposite conclusion is clearly evident.' " *Id.* (quoting *People v. Coleman*, 2013 IL 113307, ¶ 98, 996 N.E.2d 617).

¶ 122                                     2. *This Case*

¶ 123 Defendant has not established that his trial counsel labored under a *per se* conflict of interest because her prior representation of Lovelace did not fall into any of the three categories identified by *Yost*. Specifically, counsel's representation of Lovelace was not contemporaneous with her representation of defendant.

¶ 124 Nor has defendant established that his trial counsel labored under an actual conflict of interest. Defendant alleged in his written motion to dismiss counsel only that "trial counsel knew she had represented the victim in this case and failed to remove [herself] from counsel." At the hearing on defendant's motion, when the trial court read defendant's allegation back to him and asked if he had anything to add, defendant answered, "No." It was defendant's burden to identify "an actual conflict that adversely affected his counsel's performance." *Yost*, 2021 IL 126187, ¶ 38. Defendant failed to identify any specific manner in which his trial counsel's prior representation of Lovelace affected her strategy, tactics, or decision making, either in his written motion or when given the opportunity to expand upon his written motion at the hearing.

¶ 125 We also conclude that the trial court's *Krankel* inquiry was proper. As we have stated, the court's duty when conducting a *Krankel* inquiry is to ascertain the factual basis for the defendant's claim. Here, the trial court read aloud defendant's written allegation, which alleged only that trial counsel had a conflict of interest due to her prior representation of defendant. The court gave defendant the opportunity to provide more information about this alleged conflict, and defendant declined. The trial court then invited trial counsel to respond. Based upon (1) defendant's written motion, (2) defendant's statement at the hearing that he had nothing to add, (3) trial counsel's response, and (4) the trial court's familiarity with counsel's performance at trial, the court made every effort to ascertain the factual basis for defendant's plea and gathered sufficient information to properly determine that defendant's claim had no merit. Indeed, in this case, the trial court's inquiry was not merely sufficient, but thorough, and we commend the court for the procedure it employed.

¶ 126 D. Alleged Failure of Trial Counsel To Zealously Argue

Defendant's Conflict Claim

¶ 127     Defendant also argues that, weeks after the *Krankel* hearing, defendant *pro se* filed his motion for judgment of acquittal that included an affidavit claiming he did not knowingly waive the conflict of interest. Defendant claimed in the affidavit that he "did not understand his rights under the conflict law" and his counsel "never explained to me what that ment [*sic*]." Defendant contends that, "after adopting and incorporating a *pro se* filing that alleged her own ineffectiveness (specifically: that counsel acted under a conflict of interest), [counsel] did nothing to advance that claim on [defendant's] behalf." Defendant asserts that counsel's failure to "zealously argue" defendant's conflict of interest claim denied defendant effective representation during the litigation of his motion for a new trial.

¶ 128     "To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90, 162 N.E.3d 223 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Id.* (citing *Strickland*, 466 U.S. at 697).

¶ 129     "When a claim of ineffective assistance of counsel was not raised at the trial court, this court's review is *de novo*." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 85, 126 N.E.3d 703.

¶ 130     Here, defendant fails to establish either prong of the *Strickland* test. Defendant's conflict of interest claim was adjudicated at the *Krankel* hearing when the trial court found that counsel's prior representation of Lovelace created no conflict of interest. Defendant's subsequent affidavit provided no additional facts that would establish an actual or *per se* conflict of interest.

Defendant's affidavit merely claimed that he did not know what a conflict of interest was and therefore did not knowingly waive a conflict. However, as we previously concluded (*supra* ¶¶ 123-24), no conflict of interest existed. Accordingly, there was no conflict to be waived. Because defendant cannot establish (1) either that his counsel's performance was deficient or that he was prejudiced, or (2) that his attorney labored under a conflict of interest, his claim fails.

¶ 131                                  III. CONCLUSION

¶ 132          For the reasons stated, we affirm the judgment of the trial court.

¶ 133          Affirmed.

2022 IL App (4th) 210262

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Macon County, No. 17-CF-970; the Hon. Jeffrey S. Geisler, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Philip D. Payne, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Scott Rueter, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |