NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250034-U

NO. 4-25-0034

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 2, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| JARED M. STAAKE, | ) | No. 23CF237 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, holding (1) the trial evidence was sufficient to prove
defendant guilty beyond a reasonable doubt of armed violence and (2) any error in
the trial court's admission of cell phone records was harmless.

¶ 2     Defendant, Jared M. Staake, appeals his conviction for armed violence. Defendant

argues (1) the evidence at trial was insufficient to prove him guilty of the offense of armed

violence beyond a reasonable doubt and (2) the trial court erred by admitting cell phone records

as self-authenticating certified records of regularly conducted activity pursuant to Illinois Rule of

Evidence 902(11) (eff. Sept. 28, 2018). We affirm.

¶ 3                         I. BACKGROUND

¶ 4     A grand jury charged defendant with armed violence (720 ILCS 5/33A-2(a) (West

2022)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), attempted armed robbery (*id.*

§§ 8-4(a), 18-2(a)(2)), and unlawful possession of a weapon by a felon (UPWF) (*id.* § 24-1.1(a)).

The charges stemmed from an incident in March 2023 during which defendant allegedly shot Jeremy Evans. The trial court granted defendant's motion to sever the UPWF charge, and the matter proceeded to a three-day jury trial on the remaining three charges.

¶ 5                                    A. Cell Phone Records

¶ 6            On the last day of the trial, defense counsel stated that he believed the State would seek to introduce cell phone records from AT&T for defendant and two other witnesses, Chelsie Bounds and Ashley Savage. Counsel indicated he would object to the admission of the records based on deficiencies in their certifications of authenticity and lack of notice. Specifically, counsel stated that the certifications that were included in discovery were not compliant with Rule 902(11) because the certifications did not indicate they were made under oath. Counsel asserted that the State also failed to provide the requisite written notice of its intent to use the records as self-authenticating documents under Rule 902(11). The trial court stated it would not accept the certifications, but it allowed the State to attempt to obtain corrected certifications.

¶ 7            Later that day, the State submitted new certifications from AT&T. The three certifications were identical to one another except for their "Matter ID" numbers. They were notarized and stated that the record custodian making the certification had been "duly sworn." The State also submitted written notices of its intent to use the cell phone records of defendant, Bounds, and Savage.

¶ 8            Defense counsel objected to the new certifications, stating they failed to comply with Rule 902(11) because they did not state that they were made "under oath" or that they were subject to the penalty of perjury. Counsel also argued that the notices of intent were untimely.

¶ 9            The trial court ruled that the records were admissible. The court found that the certifications complied with Rule 902(11) because they were sworn before a notary, which

established the statements contained in them were made under oath. The court agreed with defense counsel that the notices of intent were untimely, but it found that excluding the records on that basis would be elevating form over substance and that defense counsel was not caught off guard by the State's attempt to have the records admitted.

¶ 10                              B. Trial Evidence

¶ 11        At the trial, Evans testified that he and Bounds had "an on-and-off relationship" for several years. Bounds reached out to Evans on the day of the incident, and they made plans for Bounds to come to his residence and "take care of [him]" because she knew he was sad about a friend's recent death. Evans believed they would have sexual relations.

¶ 12        Evans testified that, on the night of the incident, Bounds drove to his residence in a white van and asked for gas money, saying she had to work in the morning. Evans gave her money to buy gas and drinks. She left for approximately 40 minutes. When she returned, she parked in front of Evans's neighbor's house. Evans walked out to the van, opened the door, and saw Bounds crying. Someone wearing a black mask then walked up behind Evans, asked him for money, and shot him two times before he could respond. According to Evans, it sounded like the shooter had a male voice. Evans stated: "By the time I got back on my feet, [the shooter] was already running to the van. They took off." Evans then ran into his house and saw that he was bleeding. The police arrived and placed him in an ambulance. He was treated for his gunshot wounds at a hospital.

¶ 13        A Ring doorbell video recording from Evans's residence was admitted into evidence and played for the jury. The recording showed Evans leaving his house and walking over to a white van parked on the street near the house. It then showed an individual wearing dark clothing, including a long-sleeved garment, walking toward the van. In his testimony, Evans

identified this individual as the shooter.

¶ 14　　　　Three people who lived near Evans testified that they heard gunshots or fireworks on the night of the incident. They all reported seeing someone running afterwards, but they could not describe the individual.

¶ 15　　　　Bounds testified that criminal charges relating to Evans's shooting were currently pending against her. She stated the prosecutor had not promised her anything in exchange for her testimony. Bounds testified that, at the time of the incident, she was married to defendant, but they were not living together. She stated she understood that because she was married to defendant when the incident occurred, she was not allowed to testify about certain things he said to her.

¶ 16　　　　Bounds stated that, on the day of the incident, defendant picked her up in a white van. They drove to Springfield, Illinois, where they stopped at a gas station and defendant's friend's house. They later drove to defendant's grandmother's house in Beardstown, Illinois, which is where defendant lived. They stopped in a rural area before they reached Beardstown and shot at street signs with Bounds's Glock 19 handgun. When they arrived at defendant's grandmother's house, Bounds saw defendant loading a Glock 17 handgun. Both the Glock 17 and the Glock 19 belonged to Bounds. Defendant and Bounds left to pick up Savage in Jacksonville, Illinois, because she needed a ride to Beardstown. When they left, defendant had the Glock 17 either in the back of his pants or in a black box he brought with him. He was wearing a black tank top and black pants.

¶ 17　　　　Bounds testified that, after they picked up Savage, she drove to Springfield to "come by [Evans's] house." She stated that, at the time of the incident, she had known Evans for approximately three years. She had been speaking with Evans on the day of the incident, and

they made plans to "hang out" that evening, but that was "not exactly why" she went to his house. Bounds stated that she and defendant went to Evans's house "purposely for the fact of the incident." She stated that by "the incident," she meant "[Evans] being shot." She was not hoping to get money from Evans.

¶ 18 Bounds dropped defendant off a block or two away, and she drove to Evans's house. Savage was still in the vehicle. Evans gave Bounds money to buy gas and liquor. She drove away and picked defendant up where she had dropped him off. They drove to a gas station. Defendant told Savage to get out of the van, and Savage went inside the gas station to gamble. Defendant gave her a walkie-talkie and told her they would use that to communicate with her. Defendant and Savage both had phones, but they had shut them off.

¶ 19 Bounds and defendant left the gas station. Bounds again dropped defendant off a couple of blocks away from Evans's residence. She then drove to Evans's residence, and Evans walked out to the van. Then, a man wearing black pants, a black tank top, and a ski mask "came out and shot [Evans]" twice. One of the rounds hit the van. Bounds drove away at a high speed. She then saw defendant running out of an alley and "almost hit him" with the van. Defendant was wearing the same clothes she had seen the shooter wearing. Defendant got into the van, and they drove back to the gas station to pick up Savage.

¶ 20 Bounds initially testified that, when they left the gas station after picking up Savage, she drove the van so defendant could change his clothes. After he was done changing, defendant drove the van the rest of the way to Beardstown. Bounds later stated that defendant changed his clothes while she drove back to the gas station after the shooting. She believed defendant threw clothing out of the window of the van on the way to Beardstown, but she could not remember. Once they arrived in Beardstown, they dropped Savage off and drove to

defendant's grandmother's house to spend the night. Bounds testified she had been drinking heavily and taking Xanax that night.

¶ 21 Bounds testified that, on the morning after the shooting, defendant handed her cell phone to her. Bounds saw that her text message conversations with defendant had been deleted. She also saw defendant cleaning a gun that morning. She believed it was the same gun defendant had the night before, but she was not certain because the Glock 17 and the Glock 19 looked almost identical. Bounds and defendant then drove to defendant's friend's house in a rural area near Meredosia, Illinois. Defendant had the gun with him when they left. When they arrived at defendant's friend's house, Bounds went inside the house and defendant drove away. Defendant was gone for over 30 minutes. Bounds never saw the gun again. Defendant then drove Bounds to Jacksonville. On the way, he stopped on a "side road" and threw a red bag out of the vehicle.

¶ 22 Savage testified that she had known defendant for four or five years. On the day of the incident, she sent defendant a Facebook message asking for a ride to Beardstown. Bounds called her and said she and defendant would give Savage a ride. They picked her up in a white van and told her she had to "go on a ride with them." They drove to a man's residence in Springfield. Bounds dropped defendant off a couple of blocks away. When Bounds and Savage arrived at the residence, Bounds exited the van and got money from the man. Bounds and Savage then picked defendant up and drove to a gas station. Savage heard Bounds tell defendant that, if they went back, the man would give her more money. Their conversations made Savage feel uneasy, and she said she would stay at the gas station. Defendant and Bounds told Savage it "would be better" to turn off her phone, so she did. Defendant gave her a walkie-talkie to communicate with him. Savage went to the gambling room in the gas station and sat down. She knew there would be cameras in there, and she wanted to be seen. She wanted to "play it safe"

and "make sure [she] was *** not involved with whatever was going on." She stayed in the gambling room for approximately 30 minutes.

¶ 23    Defendant returned to the gas station, and Savage got back in the van. According to Savage, the van "had some issues," and it took defendant approximately 10 minutes to fix the van. They then drove to Beardstown. The prosecutor asked Savage if she heard Bounds and defendant "talking about [Bounds's] Facebook." Savage replied: "Just for her to delete it, yeah." Savage heard Bounds tell defendant she had already done so. Defendant also told Bounds that she needed to "take care of things." Bounds told defendant it was her first time seeing someone get shot, and defendant did not respond.

¶ 24    Savage testified that she saw defendant again the day after the incident. They went to defendant's friend's house for a few days. Savage said she was "hiding out" because she had outstanding warrants unrelated to Evans's shooting. Defendant tried to reassure Savage that she was not "a part of that thing," telling her that she would probably be a witness rather than an accomplice.

¶ 25    Savage stated she believed she told law enforcement officers that defendant was wearing a black peacoat and black hat on the night of the incident. She did not recall him wearing a tank top. Savage did not recall defendant changing his clothes in the van. She believed he was wearing the same clothes when he dropped her off in Beardstown as he was when he picked her up, except for the hat. She stated they stopped the van on the way to Beardstown to switch drivers because Bounds was a bad driver. When asked if Bounds was intoxicated on the night of the incident, Savage stated she could not tell whether Bounds "was drunk or stupid just because [of] the way she acts." Savage stated she never saw a gun on the night of the incident.

¶ 26    Detective Michael Fannin of the Springfield Police Department testified that he

collected a 9-millimeter spent shell casing that he found in the driveway in front of Evans's residence on the night of the incident. Detective Daniel Weiss of the Springfield Police Department later testified that a Glock 17 fires 9-millimeter ammunition.

¶ 27    Adam Potter testified that he was employed as a detective with the Morgan County Sheriff's Office. He stated he received information a few months after the incident that a firearm used in an incident in Springfield may be "off of Kuhlman Road, about a mile east of Highway 67." Other witnesses described this area as a rural area near Meredosia. Potter testified that, after searching the area, a deputy found the slide of a Glock 17 in a drainage culvert. Potter searched for the serial number on the slide in a database and learned that the firearm had been sold to Bounds.

¶ 28    Weiss testified that he interviewed Evans at the hospital on the night of the incident. Evans stated he was shot by an individual wearing a black mask. Evans stated the shooter's "voice sounded like it was a white male." Detectives performed an extraction of Evans's cell phone, and they located Facebook messages he had exchanged with Bounds on the day of the incident. Many of Bounds's messages to Evans had been "unsent." The day after the incident, Bounds sent Evans a message asking what had happened the night before.

¶ 29    Weiss testified that officers identified the white van involved in the incident and learned it belonged to defendant. Weiss spoke with Bounds the evening after the incident, and she said she was with defendant and Savage on the night of the incident. Weiss testified that Bounds gave the officers "different stories" concerning the night of the incident when they spoke with her. She gave officers permission to take possession of her Glock 19. The parties stipulated that an officer fired two shots from the Glock 19, and one of the spent shell casings was used for comparison. It did not correlate with the shell casing recovered at the scene or any other shell

casing in a police database.

¶ 30 Weiss testified that he spoke with Savage concerning the incident. Savage told Weiss that when they drove to the gas station after Bounds went to Evans's house the first time, she heard Bounds and defendant "[k]ind of planning out what was going to transpire." They discussed "what they were going to do, if somebody was going to run up behind somebody."

¶ 31 Weiss testified that officers obtained security camera video from the gas station and gaming area. The video recordings were admitted into evidence and played for the jury. The security camera video showed Savage entering the gas station, sitting in the game room for over 20 minutes, and then exiting the gas station holding a walkie-talkie. Security camera video from the exterior of the gas station showed a van driving up to the gas station. The video showed Savage running out of the gas station and getting into the van. A man then exited the front passenger door and looked under the hood of the van. The man got back into the van, and it drove away. Weiss testified that the man who exited the van "matche[d] [defendant's] description," but Weiss could not tell if the person was defendant due to the quality of the video.

¶ 32 Weiss testified that he spoke with defendant five days after the incident. A video recording of the interview was admitted into evidence and played for the jury. During the interview, defendant stated that Bounds told him that someone shot at her while she was driving his van. Defendant stated he was not with Bounds in Springfield on the night the van was shot at, and he did not believe he would be seen on video at a gas station near the time of the shooting.

¶ 33 Detective Brian Harhausen of the Springfield Police Department testified that he obtained the phone records of defendant, Bounds, and Savage from AT&T pursuant to a search warrant. The phone records were admitted into evidence over defense counsel's objection. Harhausen testified that the records contained location data. On the night of the incident, all three

phones were in close proximity to each other at approximately 11 p.m. in the area around Jacksonville. No data points were observable on defendant's phone from approximately 11 that night until 1:30 the next morning. All three phones were again in close proximity to each other at 1:30 a.m. around Beardstown. At approximately 3 p.m. on the day after the incident, defendant's phone was in the area where the Glock 17 slide was later found.

¶ 34        The jury found defendant guilty of armed violence and aggravated battery with a firearm and not guilty of attempted armed robbery.

¶ 35        C. Posttrial Proceedings

¶ 36        Defendant filed a motion for a new trial arguing, *inter alia*, that the trial court erred by allowing the State to introduce the AT&T records as self-authenticating documents because it failed to provide timely written notice of its intent to do so and the certifications accompanying the records did not comply with Rule 902(11) because they did not state they were made under oath. The court denied the motion for a new trial.

¶ 37        The trial court initially sentenced defendant to concurrent terms of 25 years' imprisonment for both armed violence and aggravated battery with a firearm. However, the court subsequently vacated his sentence for aggravated battery with a firearm on the basis that it was a lesser-included offense of armed violence. Upon the State's motion, the court dismissed the charge of UPWF.

¶ 38        This appeal followed.

¶ 39        II. ANALYSIS

¶ 40        On appeal, defendant argues (1) the evidence at trial was insufficient to prove him guilty of the offense of armed violence beyond a reasonable doubt and (2) the trial court erred by

admitting cell phone records as self-authenticating certified records of regularly conducted activity pursuant to Rule 902(11).

¶ 41                                    A. Sufficiency of the Evidence

¶ 42          Defendant argues that the trial evidence was insufficient to prove him guilty beyond a reasonable doubt of armed violence. Specifically, defendant contends that the evidence was insufficient to establish that he was the shooter. Defendant asserts that the "closest thing to an identification" that was given at trial was Bounds's testimony that the shooter was wearing the same clothes that defendant had been wearing. However, defendant notes that a video recording of the alleged shooter showed that he was wearing long sleeves rather than a tank top (as Bounds claimed). Defendant asserts that the State's case was entirely circumstantial, and it relied on mere conjecture to secure a guilty verdict.

¶ 43          "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35. When a reviewing court is presented with a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 44          "[I]t is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Gray*, 2017 IL 120958, ¶ 35. Accordingly, "a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* We will not reverse a criminal conviction on the basis of insufficient evidence "unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's

guilt." *Id.* "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330 (2000). However, "[t]he trier of fact need not *** be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *Id.*

¶ 45 Here, to prove defendant guilty of armed violence, the State was required to establish that defendant, while armed with a dangerous weapon, committed a qualifying felony offense. 720 ILCS 5/33A-2(a) (West 2022). In this case, the charged predicate felony offense for armed violence was aggravated battery, in that defendant committed a battery while wearing a mask to conceal his identity. See *Id.* § 12-3.05(f)(2). Defendant does not dispute that the State proved Evans was shot by a masked individual, but he argues only that the evidence was insufficient to prove he was the individual who shot Evans.

¶ 46 Viewing the evidence in the light most favorable to the State, we conclude a rational trier of fact could have found defendant was guilty beyond a reasonable doubt of armed violence, as there was strong circumstantial evidence that defendant was the shooter. Bounds testified that she and defendant went to Evans's house on the night of the incident "purposely for the fact of the incident," by which she meant "[Evans] being shot." She saw defendant in possession of a Glock 17 handgun that she owned when they left his grandmother's house to drive to Evans's house. Bounds stated she dropped defendant off a couple of blocks away from Evans's house just before the shooting. She then drove to Evans's house and saw a masked individual wearing clothes similar to what defendant had been wearing shoot Evans. She drove away from the scene and encountered defendant running toward her van a short time later.

Bounds stated she saw defendant cleaning a gun the day after the shooting and that he took the gun to a friend's house in a rural area near Meredosia that day. She did not see the gun again after that. The slide of a Glock 17 registered to Bounds was later found in a drainage culvert in a rural area near Meredosia.

¶ 47 Bounds's testimony concerning the events on the night of the incident was partially corroborated by Savage, who, though not present at the time of the shooting, was with Bounds and defendant shortly before and after the incident. Savage's account of what happened before and after the shooting was largely consistent with Bounds's testimony. Weiss testified that Savage told him that before Bounds and defendant dropped her off at a gas station, she heard them discussing "what they were going to do, if somebody was going to run up behind somebody." Savage testified that after Bounds and defendant returned to the gas station and picked her up, she heard defendant tell Bounds to delete "[her] Facebook" and "take care of things." She also heard Bounds tell defendant she had never seen someone get shot before, and defendant did not respond.

¶ 48 Defendant contends that Bounds's testimony did not establish that he was the shooter because she merely stated the shooter was wearing the same clothing as defendant, which, according to Bounds, was a tank top and black pants. However, defendant notes, the video recording from Evans's doorbell camera showed that the shooter was wearing long sleeves, and Savage testified she did not recall defendant wearing a tank top that night. Defendant also contends that Bounds's testimony was not credible because she stated she had been drinking heavily and taking Xanax on the night of the incident, and there were other inconsistencies in her testimony. For example, defendant notes that Bounds gave inconsistent accounts as to when he changed his clothes after the shooting and as to whether they were inside

- 13 -

or outside the van when they shot at street signs in a rural area several hours before the incident. Defendant also asserts that Weiss testified that Bounds had given the police different stories concerning the night of the incident.

¶ 49 We find that none of the foregoing inconsistencies rendered the State's evidence so improbable and unsatisfactory that no rational trier of fact could find the State had proven beyond a reasonable doubt that defendant was the shooter. While Bounds's testimony that the shooter was wearing a tank top was inconsistent with the Ring doorbell video and Savage's testimony concerning defendant's clothing, there was other circumstantial evidence indicating that defendant was the shooter. See *supra* ¶¶ 46-47. The other inconsistencies defendant identifies in Bounds's testimony concerned relatively minor or collateral details. It was for the jury to resolve the inconsistencies in the evidence, and we will not substitute our judgment for that of the jury on questions involving the weight of the evidence or credibility of witnesses. See *Gray*, 2017 IL 120958, ¶ 35.

¶ 50 B. Cell Phone Records

¶ 51 Defendant argues that the trial court committed reversible error by admitting cell phone records from AT&T as self-authenticating documents pursuant to Rule 902(11) where the accompanying certifications failed to comply with the requirements of the rule. Rule 902(11)provides:

"Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

\* \* \*

(11) Certified Records of Regularly Conducted Activity. The original or a duplicate of a record of regularly conducted activity that

would be admissible under Rule 803(6) if accompanied by a written certification of its custodian or other qualified person that the record

> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters;

> (B) was kept in the course of the regularly conducted activity; and

> (C) was made by the regularly conducted activity as a regular practice.

The word "certification" as used in this subsection means with respect to a domestic record, a written declaration under oath subject to the penalty of perjury \*\*\*. A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and certification available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." Ill. R. Evid. 902(11) (eff. Sept. 28, 2018).

¶ 52       A trial court's ruling concerning the admissibility of evidence is ordinarily reviewed for an abuse of discretion. *People v. Fox*, 2022 IL App (4th) 210262, ¶ 77. "However, the proper interpretation of Rule 902(11) is a question of law that is reviewed *de novo*." *Id.*

¶ 53       Here, defendant contends that the certifications accompanying the AT&T records were noncompliant with Rule 902(11) because they failed to assert that the certifications were made under oath subject to the penalty of perjury or that the records accompanying the

certifications were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of the matters. See Ill. R. Evid. 902(11) (eff. Sept. 28, 2018). Defendant also argues that the certifications failed to state that the records were kept in the course of regularly conducted activity or were "made by the regularly conducted activity as a regular practice" (*id.*), and the State failed to provide a timely written notice of its intent to use the records. Defendant further argues that the certifications failed to comply with the requirements of Illinois Rules of Evidence 902(12) and 902(13) (eff. Sept. 28, 2018) because there was no indication that the records were obtained by an electronic system that functioned properly or produced accurate results.

¶ 54    The State argues that defendant forfeited his argument that the certifications failed to comply with Rules 902(12) and 902(13) by failing to object to the admission of the records on this basis at trial. The State notes that defendant objected to the certifications at trial solely on the basis that they did not sufficiently indicate they were made under oath and subject to the penalties of perjury and "should be deemed to have waived any insufficiency in the foundation set forth by the State." The State also argues that any error in the admission of the records was harmless.

¶ 55    Even if we were to accept defendant's argument that the AT&T records in this case were erroneously admitted, any error in the admission of the records was harmless. An evidentiary error is harmless where there is no reasonable probability that the jury would have acquitted the defendant absent the error. *Fox*, 2022 IL App (4th) 210262, ¶ 84.

¶ 56    Here, the AT&T records showed that cell phones belonging to defendant, Bounds, and Savage were in close proximity to each other on the night of the incident at approximately 11 p.m. around Jacksonville and were again in close proximity at 1:30 a.m. the next day around

Beardstown. However, this evidence was merely cumulative of other evidence admitted at the trial. Bounds and Savage testified that they were with defendant on the night of the incident, and there was security camera video from the gas station where Savage had stayed during the incident showing a man who "matche[d] [defendant's] description" exiting a white van that Savage had entered.

¶ 57 The AT&T records also showed that, at approximately 3 p.m. on the day after the incident, defendant's phone was in the area where the Glock 17 slide registered to Bounds was later found. While there was no other evidence indicating that defendant was in this precise location, Bounds's testimony showed that, on the day after the incident, defendant was in the general area where the slide was later found. Even without the evidence connecting defendant to the Glock 17 slide, a reasonable probability does not exist that defendant would have been acquitted of armed violence based on other circumstantial evidence indicating he was the shooter. See *supra* ¶¶ 46-47.

¶ 58 III. CONCLUSION

¶ 59 For the reasons stated, we affirm the trial court's judgment.

¶ 60 Affirmed.